UNITED STATES of America, Plaintiff,

v.

Martin Kelly MILLER, Defendant.

UNITED STATES of America, Plaintiff,

v.

Grigory DONSKIKH, Defendant.

UNITED STATES of America, Plaintiff,

v.

Bruce BEDRICK, Defendant.

UNITED STATES of America, Plaintiff,

v.

Carno Ian PAYNE, Defendant.

UNITED STATES of America, Plaintiff,

v.

Santana Romero DOTTERY, Defendant.

UNITED STATES of America, Plaintiff,

v.

Adrian Keith FINNELL, Defendant.

UNITED STATES of America, Plaintiff,

v.

Peter SOLA, Defendant.

Cr. Nos. 90–261 JP, 92–275 JP, 92–285 JP, 92–292 JP, 92–343 JP, 92–379 JP and 92–378 JP.

United States District Court,
D. New Mexico.

Jan. 26, 1993.

Michael E. Vigil, Marchiondo & Vigil, Albuquerque, NM, for Adrian K. Finnell.

James D. Tierney, U.S. Attys. Office, Albuquerque, NM, for U.S. in Cr. No. 92–379 JP.

Nancy Hollander, Freedman, Boyd, Daniels, Peifer, Hollander, Guttmann & Goldberg, Albuquerque, NM, for Peter Sola.

Stephen R. Kotz, U.S. Attys. Office, Albuquerque, for U.S. in Cr. No. 92–378 JP.

Tova Indritz, Federal Public Defender's Office, Albuquerque, NM, Seymour Friedman, Brooklyn, NY, Adam G. Kurtz, Albuquerque, NM, for Grigory Donskikh.

Louis E. Valencia, U.S. Attys. Office, Albuquerque, NM, for U.S. in Cr. No. 92–275 JP.

Roberto Albertorio, Richard A. Winterbottom, Albuquerque, NM, for Bruce Gary Bedrick.

David N. Williams, U.S. Attys. Office, Albuquerque, NM, for U.S. in Cr. No. 92–285 JP.

Ruth Olcutt Pregenzer, Federal Public Defender's Office, Albuquerque, NM, for Martin Kelly Miller.

Thomas L. English, U.S. Attys. Office, Albuquerque, NM, for U.S. in Cr. No. 90–261 JP.

Alan F. Zvolanek, Albuquerque, NM, for Carno Ian Payne.

Presiliano Torrez, U.S. Attys. Office, Albuquerque, NM, for U.S. in Cr. No. 92–292 JP.

Tova Indritz, Federal Public Defender's Office, Albuquerque, NM, Che Karega, Southfield, MI, for Santana Romero Dottery.

David N. Williams, U.S. Attys. Office, Albuquerque, NM, for U.S. in Cr. No. 92–343 JP.

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

Trains: Icons of American folklore; venerated objects of our nation's songs.[1] One of them, Amtrak Train No. 4, the august "Southwest Chief", which has been traveling the rails through Albuquerque since 1939, provided the stories that unfolded in these seven criminal cases. The defendant in each case arrived in Albuquerque, New Mexico aboard the Southwest Chief possessing contraband, which he now asks be suppressed as evidence in his case. Disposition of the motions to suppress is controlled by the recent opinions of the United States Court of Appeals for the Tenth Circuit in *United States v. Hall*, 978 F.2d 616 (10th Cir.1992), *United States v. Bloom*, 975 F.2d 1447 (10th Cir.1992), and *United States v. Ward*, 961 F.2d 1526 (10th Cir. 1992), each of which also involved a defendant who chose the Southwest Chief as a means to cross the country. A synthesis of *Ward*, *Bloom*, and *Hall* dictates that in each of these seven cases the evidence seized must be suppressed.

## I. INTRODUCTION

These cases all arise as a result of the routine practice of the Drug Enforcement Administration (DEA) Albuquerque Metro Narcotics Task Force.[2] In efforts to reduce the flow of narcotics from west to east, law enforcement officers routinely accost and question passengers traveling on

---

1. For examples listen to Jimmy Rogers' "Hobo Utopia" ("Will there be freight trains in heaven, any boxcars in which I might ride?"); Michelle Shocked's "If Love Was a Train" ("If love was a train, I think I would ride me a slow one, ... Woo Woo ... But love ain't no train, naw, more like a broncing bull ..."); Steve Goodman's "City of New Orleans" ("I'm the train they call the City of New Orleans, And I'll be gone 500 miles when the day is done ..."); or more apropos to the matter at hand, The Grateful Dead's "Casey Jones" ("Driving that train, high on cocaine, Casey Jones you better watch your speed, Trouble ahead, trouble behind, don't you know that notion just crossed my mind"); and of course, everyone's old time favorite, the "Wabash Cannonball."

2. The Albuquerque Metro Narcotics Task Force, although operated by the DEA, includes employees of local law enforcement agencies.

Amtrak Train No. 4 when it makes its regular station stop in Albuquerque, New Mexico.[3] In most cases the agents choose which passengers to question by reviewing the manifest for Train No. 4 prior to its arrival in Albuquerque. An agent can, and often does, request a printout of an individual reservation when a particular name on the manifest piques the agent's interest. Alternatively, an agent sometimes receives a "tip" from an Amtrak employee suggesting that a certain passenger might be worth "checking out." The evidence in the cases before me showed that solo travel, cash payment, the purchase of a one-way ticket, the purchase of the ticket one or two days before departure, and the use of a sleeper roomette, were factors used by individual agents, as well as the train employees in determining which passengers would be questioned.[4]

■ The root issue of all the suppression motions is whether the encounters which occurred between defendants and the law enforcement agents on or around Amtrak Train No. 4 were consensual encounters or investigative detentions. If a particular encounter was an investigative detention, then the agent involved must have had reasonable suspicion of criminal activity at the time of the seizure to constitutionally detain the defendant. *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). Absent reasonable suspicion for an investigative detention, I must suppress any items seized as a result of the detention. *Wong Sun v. United States*, 371 U.S. 471, 484–488, 83 S.Ct. 407, 415–418, 9 L.Ed.2d 441 (1963).

While I find in each case before me that the defendant's Fourth Amendment rights were violated because he was subjected to an investigative detention unsupported by reasonable suspicion, in several cases, my inquiry cannot end there. In some cases the defendant allegedly consented to a detention and/or search of his luggage which contained contraband. The law is clear that luggage may be detained or searched if the detention or search is conducted pursuant to a voluntary consent. *United States v. Guglielmo*, 834 F.2d 866, 868 (10th Cir.1987), *citing to Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In making a determination of the voluntary nature of consent the Tenth Circuit employs a two part test:

1. there must be clear and positive testimony that the consent was unequivocable and specific and freely given; and,

2. the government must prove the consent was given without duress or coercion.

*Guglielmo*, 834 F.2d at 868; *United States v. Price*, 925 F.2d 1268 (10th Cir.1991) (eliminating the presumption against waiver of fundamental constitutional rights in the context of consent to search cases).

■ The voluntariness of the consent is a factual determination to be made from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Where a Fourth Amendment violation has occurred prior to the defendant purportedly giving consent, I must also decide whether that consent was "sufficiently an act of free will to purge the primary taint of the [Fourth Amendment violation]." *United States v. Maez*, 872 F.2d 1444, 1453 (10th Cir.1989). "When attempting to establish that there was voluntary consent after an illegal stop ... the Government has a heavier burden to carry than when the consent is given after a permissible stop." *United States v. Recalde*, 761 F.2d 1448, 1457 (10th Cir.1985) (citations omitted). I must consider the "[t]emporal proximity of the arrest and the [consent], the presence of intervening cir-

---

**3.** While all defendants were initially stopped and questioned by only one agent, the facts of the seven cases varied concerning whether a single law enforcement officer "worked" Amtrak Train No. 4 on a particular day or whether two or more officers worked together to gather information and ultimately seize the contraband.

**4.** The testimony in each of the seven cases revealed that these factors played varying roles in an agent's decision to accost a defendant in a particular case. Thus, later in this memorandum opinion and order I repeat in my discussion of the facts of each case the agent's precise testimony about the factors as given in that particular case.

cumstances, and, particularly, the purpose and the flagrancy of the official misconduct...." *Maez*, 872 F.2d at 1454, *quoting Brown v. Illinois*, 422 U.S. 590, 603–604, 95 S.Ct. 2254, 2261–2262, 45 L.Ed.2d 416 (1975). If there is no break in the causal connection between the initial Fourth Amendment illegality and the consent, any evidence seized as a result of the consent must be suppressed as tainted fruit of the poisonous tree. *Maez*, 872 F.2d at 1453–1454; *Brown*, 422 U.S. at 601, 95 S.Ct. at 2260.

## II. SEIZURE OR CONSENSUAL ENCOUNTER

In *Florida v. Bostick*, ⸺ U.S. ⸺, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) the Supreme Court clarified the standard to be used in determining whether an encounter between a law enforcement officer and a citizen amounts to an investigative detention where factors other than the officer's presence would have made the defendant not feel free to leave. In such a case the Court directed that the "crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick*, ⸺ U.S. at ⸺, 111 S.Ct. at 2387, *quoting Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988); *see also Ward*, 961 F.2d at 1530.

In *Ward*, the Tenth Circuit concluded that an encounter between two law enforcement officers and a person in the confines of his private train compartment constituted an investigative detention when an officer asked incriminating questions and failed to advise the person of his right to terminate the encounter. Under the factual circumstances presented in *Ward* the Tenth Circuit concluded that defendant was seized "during the initial encounter in the train roomette, specifically at the time when, without informing defendant of his right to terminate the encounter, the detective first began to ask defendant potentially incriminating questions." *Ward*, 961 F.2d at 1534.[5]

In *Bloom*, faced with a factual situation almost identical to that in *Ward*, the court confirmed, clarified and extended its earlier holding. The *Bloom* court implied that, in the absence of an advice of rights, an encounter between police and a lone individual in a private train compartment almost per se amounts to an investigative detention for which reasonable suspicion must be present. In *Bloom*, unlike in *Ward*, the officers did not enter the defendant's compartment but remained standing in the doorway. Moreover, for most of the encounter there was only one, not two officers present.[6] However, the *Bloom* court still found that because of the nonpublic nature of the compartment and the surrounding area "the agents' conduct would likely communicate to a reasonable person that he was unable to decline the agents' request or otherwise terminate the encounter." *Bloom*, 975 F.2d at 1453. Additionally, as in *Ward*, the nature of the questioning was "focused" and "potentially incriminating." Finally, neither agent ever indicated to defendant that he was free to ignore their presence or terminate the encounter.[7] In *Bloom* the Tenth Circuit

---

**5.** Unfortunately, the *Ward* case is unclear as to whether the "potentially incriminating questions" began with the first question or at some later point in the conversation. However, both *Bloom* and *Hall* seem to interpret *Ward* as holding that seizure occurs when the officer makes known to the defendant that the officer is looking for contraband and then asks the traveler if he possesses contraband or if the officer can search his luggage.

**6.** The second officer remained out of sight in a nearby compartment for most of the encounter. The officer who performed the majority of questioning was in uniform and visibly armed.

**7.** In *Ward* the Tenth Circuit explained that an encounter in a small private train compartment "test[ed] the limits of *Bostick*." *Ward*, 961 F.2d at 1528. The court distinguished *Bostick*, which rejected a per se rule that would prohibit law enforcement officers from questioning bus passengers about criminal activity without reasonable suspicion, on the ground that in *Ward* "there was no advice that the one questioned had the right to refuse consent and there were no other persons in the vicinity who might witness the investigation." *Ward*, 961 F.2d at 1528.

ruled that the seizure occurred precisely "when Agents Small and Ochoa questioned defendant about whether he was transporting narcotics while he was confined in a private train compartment without advising him that he was free to decline the agents' request or terminate the encounter." *Bloom*, 975 F.2d at 1455–1456.[8]

Applying the test outlined by the Supreme Court in *Bostick* for determining whether a seizure had occurred, the three-judge panel which decided *Ward* emphasized the following factors, among the totality of circumstances, as establishing a seizure for purposes of the Fourth Amendment:[9]

1. *The physical circumstances of the place of the encounter.* The encounter occurred in a confined area in a nonpublic setting. The defendant's roomette was a small private compartment with a narrow doorway that opened into a narrow aisle. *Ward*, 961 F.2d at 1530–1531.

2. *Aloneness during encounter.* While being questioned, the defendant was alone except for the officers. "A reasonable innocent person who is alone when approached by law enforcement officers is more likely to feel that he or she was the specific object of the officers' inquiry." *Id.* at 1532.

3. *A roomette traveler has a higher expectation of privacy.* The panel of the Tenth Circuit which decided *Ward* noted that "an individual traveling in a private train roomette has a higher expectation of privacy than an individual traveling in a public passenger car of the train." *Id.* at 1531–32. However, in *Bloom*, a different panel of the Tenth Circuit stated that the higher expectation of privacy of a roomette traveler "has limited relevance to the question of whether a reasonable person would believe that he or she is unable to terminate the encounter" although "it would have some relevance if we were reviewing a search of the compartment." *Bloom*, 975 F.2d at 1453, n. 6. Since some of the cases I am considering in this opinion involve searches within a roomette, in those cases I will assign this factor some relevance, but I will consider this factor to have limited relevance, without ignoring it completely, in the other cases where the search occurred outside the roomette.

4. *Nature of questions.* In *Ward*, the Tenth Circuit stated that a person's feeling that he or she was the specific object of an officer's inquiry "would be heightened when the officers make not just general inquiries, but ask focused, potentially incriminating questions." *Ward*, 961 F.2d at 1532. Although the court in *Ward* was not specific as to what would constitute "focused, potentially incriminating questions", the court in *Bloom* made it clear that this definitely occurs when an officer asks a person whether he or she is carrying drugs after informing the person that the officer was on the train to interdict drug traffickers. *Bloom*, 975 F.2d at 1454–1456.

5. *Manner of Questioning.* The court in *Ward* commented on the officer's "blunt" and "direct" manner of questioning. The opinions in both *Ward* and *Bloom* cite *United States v. Savage*, 889 F.2d 1113, 1115, 1117 (D.C.Cir.1989) regarding the "direct and probably forceful" character of the questioning. *Ward*, 961 F.2d at 1533; *Bloom*, 975 F.2d at 1454.

6. *Failure to advise that the defendant had the right to decline the officers' request or terminate the encounter.* In

---

**8.** Subsequent to the *Ward* and *Bloom* decisions the Tenth Circuit addressed the issue of when a seizure occurs in *United States v. Laboy*, 979 F.2d 795 (1992). In *Laboy* the court held that defendant was not seized when an undercover detective in plainclothes who was standing next to three arrestees, two of whom had their hands cuffed behind their backs, motioned from across a public street to defendant and subsequently questioned defendant after he crossed the street. While the *Laboy* court referred to *Ward* and *Bloom*, it observed that the factors in those cases which supported a conclusion that a seizure had occurred, i.e. the encounter occurring in a nonpublic or a small, enclosed place, were not present in *Laboy*. Accordingly, while I note the holding of *Laboy*, it is *Ward* and *Bloom* which control the analysis here given the factual similarity between them and the cases before me.

**9.** A different three-judge panel in *Bloom* stressed the same factors, with some exceptions which are noted in the following discussion.

*Ward,* the court expressed the view that "the officers' failure to advise defendant of his right to terminate the encounter should be given even greater weight" when the encounter is in a "confined, non-public area." *Ward,* 961 F.2d at 1533. In *Bloom,* the court seemed to broaden the scope of advice that might be necessary to avoid seizure by stating, "the officers never advised the defendant that he was free to decline their requests or otherwise terminate the encounter", instead of referring simply to "the right to terminate the encounter" discussed in *Ward. Bloom,* 975 F.2d at 1454.

7. *Number and attire of officers.* In *Ward,* the court stated that "the presence of more than one officer increases the coerciveness of an encounter." *Ward,* 961 F.2d at 1533. In *Bloom,* the court reiterated the significance of a defendant knowing that he was outnumbered by law enforcement officers. Although the officers in *Ward* were not in uniform or visibly armed, the court instructed that courts in the Tenth Circuit must assume that a reasonable person would believe a police officer is armed regardless of whether a weapon is visible. *Ward,* 961 F.2d at 1526, n. 6. *Bloom* teaches that if an officer is in uniform and visibly armed the coercive effect is greatly enhanced. *Bloom,* 975 F.2d at 1454.

8. *Personal traits of defendant.* The *Ward* opinion discussed the defendant's small stature and the fact that he recently had undergone surgery for which he was still taking medication. The court cited *United States v. Recalde,* 761 F.2d 1448, 1454 (10th Cir.1985) for the proposition that personal traits are relevant to whether a person would feel free to terminate an encounter and stated that "defendant's slight physique and health problems would tend to suggest that defendant was more easily intimidated than some other persons; the personal traits of an individual are relevant to the issue of coercion." *Ward,* 961 F.2d

at 1533. However, the panel which decided *Bloom* stated that "whether a person has been seized is a legal question governed by the 'reasonable person' standard which by definition precludes consideration of the defendant's subjective characteristics and perceptions." *Bloom,* 975 F.2d at 1455, n. 9. In *Bostick* and *California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) the Supreme Court announced in rather lucid language that an objective "reasonable person" test is to be applied in determining whether a seizure has occurred under the Fourth Amendment. *Bostick,* —— U.S. at —— - ——, 111 S.Ct. at 2387–2388; *Hodari,* —— U.S. at ——, 111 S.Ct. at 1551 (objective test for determining whether a person is "seized" asks "not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person"). Consequently, the panel which decided *Bloom* read *Ward* restrictively, stating that personal traits are not "relevant in applying Bostick's reasonable person test, other than to the extent they may have been known to the officer and influenced his conduct." *Bloom,* 975 F.2d at 1455, n. 9. Nevertheless, the panel in *Ward,* which issued its opinion a year after *Bostick* and *Hodari,* indicated quite clearly that personal traits of a defendant are relevant in deciding whether the defendant would feel unable to terminate an encounter with law enforcement officers. Moreover, the *Ward* opinion specifically states that the appeal in that case "tests the limits of *Bostick.*" *Ward,* 961 F.2d at 1528.[10] Under these circumstances, being uncertain as to how the issue ultimately will be resolved, I will (1) make factual findings regarding personal traits of the defendants in the cases before me so those factual determinations will be available to whichever panel or panels may revisit the issue on appeal, but I will (2) apply an objective "reasonable person" test in deter-

**10.** I cannot help but note that the panel which decided *Ward* was comprised of two regular judges of the Tenth Circuit Court of Appeals plus a district court judge and the panel which decided *Bloom* had two different regular Tenth

Circuit judges, plus a senior judge of the Tenth Circuit Court of Appeals. Ergo, only four of the ten regular judges on the court have taken positions on the issue and among them the score is currently tied.

mining whether and when a seizure has occurred, since that is my understanding of the messages of *Bostick* and *Hodari;* and I will therefore attribute no significance to a defendant's personal traits that I find to be established by the evidence unless they were known to and influenced the conduct of the law enforcement officer.[11,12]

## III. *REASONABLE SUSPICION*

The *Ward* and *Bloom* decisions also provide guidance concerning factors which may form a basis for reasonable suspicion. In *Ward* the court held that the following factors, known to the agents at the point of seizure, were insufficient, in sum, to establish reasonable suspicion because they were consistent with innocent travel: (1) defendant's real name was different from the name on his ticket; (2) defendant had paid $600.00 cash which he pulled out of his boot for a one-way ticket from Flagstaff, Arizona to Kansas City, Missouri; (3) defendant had reserved the largest private roomette which accommodated six people even though he was traveling alone; (4) defendant left a call back number with a Tucson, instead of a Flagstaff, prefix when the reservation was made; and (5) Tucson was known as a drug origination point and Flagstaff as a connecting point.

In *Bloom,* prior to seizing defendant the agents knew that (1) defendant was traveling alone in a private train compartment; (2) he had paid $679 cash for a one-way ticket from Flagstaff, Arizona to New York City; (3) he purchased the ticket shortly before departure; (4) he kept his luggage, which was a type commonly used by drug-traffickers, in his private compartment; (5) he had asked a train attendant why the DEA agents were on the train; (6) he appeared to be "very nervous" and "somewhat excited"; and (7) Arizona is an origination point for marijuana, and New York City is a major distribution point. The *Bloom* court found that certain of these factors were "wholly consistent with innocent travel" and other factors were "not inconsistent with innocent travel." *Bloom,* 975 F.2d at 1457–1458. In addition, the court noted that defendant's nervousness and excitement were not a proper basis for reasonable suspicion because they involved a "subjective evaluation" of the defendant's behavior and not the requisite objective facts necessary to support reasonable suspicion.[13]

*United States v. Hall,* 978 F.2d 616 (10th Cir.1992) also bears on this issue. Although *Hall* involved the seizure of luggage and not the seizure of a person, the *Hall* court made clear that "[t]he same degree or quantum of reasonable suspicion is required to detain a person as is required to detain a person's luggage" and that "in

---

**11.** Although I have made findings regarding the relative sizes of the defendants and the officers in each of the following cases, in none of the cases was any evidence presented concerning how any size differentials affected the behavior of the officers.

**12.** If I were to follow the suggestion of *Ward* on this issue and take personal traits into account in trying to decide whether they influenced a particular person's belief that he or she was unable to terminate an encounter with law enforcement officers, I would have some difficulty determining, under the teaching of *Ward,* what weight to give to which traits. *Ward* indicated that a defendant's slight physique and health problems would make him feel unable to terminate an encounter because such a person would be "more easily intimidated than some other persons." *Ward,* 961 F.2d at 1533. In contrast, the court in *Ward* also seemed to imply that the fact the defendant had prior contact with police officers, i.e. he had been arrested twice before, and was aware that he did not have to talk to

police officers under certain circumstances, does not factor into the equation. *Ward,* 961 F.2d at 1531. Utilizing the language of *Ward,* an astute defense attorney could, in good faith, advance an argument that personal traits which render a person less able than the average to resist or terminate an encounter with police should be taken into account whereas prior experiences or personal traits which might make a person more likely than the average to understand an ability to terminate an encounter should not be considered.

**13.** However, in another area of Fourth Amendment analysis, addressing the requisite level of suspicion necessary to detain a traveler at a permanent border patrol checkpoint for questioning unrelated to citizenship concerns, the Tenth Circuit has held that nervousness alone can give rise to reasonable suspicion. *See United States v. Benitez,* 899 F.2d 995 (10th Cir. 1990); *see also United States v. Preciado,* 966 F.2d 596 (10th Cir.1992).

determining whether an officer has reasonable suspicion to detain a traveler and his luggage ... this court appl[ies] the same test." *Hall*, 978 F.2d at 620–621. Moreover, *Hall* is important because it provides the Tenth Circuit's most recent refinement of the definition of reasonable suspicion raised by *Ward* and *Bloom.*

In *Hall* prior to seizing defendant's luggage the agents were aware of the following facts: (1) defendant boarded the train in Flagstaff even though she was from Reno, Nevada; (2) defendant was traveling to Harrisburg, Pennsylvania; (3) defendant was traveling alone in a private compartment; (4) defendant paid cash for a one-way ticket; (5) defendant left a call-back number of a California travel agency; (6) defendant was traveling with heavy suitcases; and (7) defendant appeared to be nervous. As in *Ward* and *Bloom,* the court found that "these factors [were] entirely consistent with innocent travel and therefore raise only a minimum degree of suspicion." *Hall*, 978 F.2d at 621. The court's finding that the factors indicative of "innocent travel" "raise only a minimal degree of suspicion" confirmed the almost minuscule weight to be accorded these indicia of "innocent travel" as set forth in *Bloom;* "while factors consistent with innocent travel can, when taken together rise to reasonable suspicion, the degree of suspicion that attached to these particular factors is minimal." *Bloom*, 975 F.2d at 1458, *citing to United States v. Sokolow,* 490 U.S. 1, 9–10, 109 S.Ct. 1581, 1586–1587, 104 L.Ed.2d 1 (1989).[14]

*Ward* gives some indication of what, in the context presented by the cases before me, may be sufficient to constitute reasonable suspicion. In *Ward*, the Tenth Circuit found that once the agents discovered evidence unequivocally indicating that defendant was lying as to significant matters, reasonable suspicion existed. *Ward*, 961 F.2d at 1530. During questioning, the defendant in *Ward* had explained the discrepancy between the name on his ticket and the name on his picture ID by informing the agents that a friend had made the reservation for him in the friend's name. In response to a direct question the defendant had also stated that his only luggage was his shoulder bag. Sometime after receiving this information, Agent Small left defendant's roomette and independently confirmed that both of these statements were untrue. However, because the agents did not have this information prior to seizing defendant, it could not be used to establish the reasonable suspicion necessary to validate defendant's seizure. *Ward*, 961 F.2d at 1530.

## IV. THE SEVEN CASES

With the above law in mind I now turn to the facts in each of these seven cases, as I find them to be from the evidence presented for my consideration.[15]

*United States of America v. Martin Kelly Miller,* Cr. No. 90–261 JP

█ On June 6, 1990, Amtrak Train No. 4 eastbound from Los Angeles arrived late in Albuquerque. DEA Agent Kevin Small, who is a lawyer and an experienced narcotics task force officer (by then he had been involved in approximately 130 seizures of contraband from Amtrak trains) was working the drug interdiction program at the Albuquerque train station that day. Small did not have a train manifest, but he spoke to two senior train attendants who in Small's experience had been very reliable in giving tips about passengers traveling with

---

**14.** In both *Ward* and *Hall* the agents first received a portion of their information from "reliable informants", namely Amtrak train employees. Neither case discusses this factor except in passing. It appears that the information from the Amtrak informants cannot work to independently establish reasonable suspicion because the information available to them, which they relay to the law enforcement officers, involves the same factors which the Tenth Circuit considers indicia of innocent travel.

**15.** The conversations between the defendants and law enforcement officers were tape recorded in all cases except *United States v. Miller,* Cr. No. 90–261 JP and *United States v. Donskikh,* Cr. No. 92–275 JP. The cassettes bearing the tape recordings and transcripts of the conversations were admitted as exhibits. I note that the tape recordings of the conversations made easier my task of determining the credibility of the witnesses.

drugs. They told Small that a passenger named Mark Kelly had extremely heavy luggage, including a very heavy footlocker, and that Kelly had told them he was taking books to his brother who lived in Chicago. The train attendants also advised Small that they did not believe Kelly's story and they showed Small Kelly's footlocker which was on the lower level in the common luggage area. In addition, the attendants told Small that Kelly was in roomette A of car 431, the last roomette on the last car of the train.

Roomette A is a deluxe sleeper roomette which is 5 feet 8 inches wide and 7 feet 2 inches long. The deluxe roomette sleeps 2 people and has a private sink, toilet and shower. The adjoining hallway and the entrance from the hallway into the roomette are approximately 26 inches wide. All of the roomettes on car 431 are private roomettes similar to roomette A; there are no public seating areas on that car.

In his experience, Small had observed a certain pattern of drug runners which caused him to focus on (1) eastbound travelers on Train No. 4 going from Los Angeles to Chicago (because Los Angeles was the leading source city in the United States for drugs and Chicago was a large drug distribution point), (2) passengers who traveled in sleeper cars (because they could keep their suitcases there without being exposed to dog sniffs or the possibility of someone "ripping them off"), (3) passengers who traveled alone (because drug couriers strive for privacy to keep their conduct secret), (4) travelers who purchased tickets shortly before departure (because in the drug trade there are tight delivery deadlines and couriers do not want to be in possession of the contraband for long periods of time), (5) people who pay cash for their tickets (because cash purchasers leave no paper trails that can be traced), (6) passengers who buy one-way tickets, (7) passengers who leave false or no call-back numbers and (8) people traveling under aliases. In Small's experience, a majority of these factors was present in each of the cases in which he had seized drugs being transported on Train No. 4 by couriers. To Small it was like piecing together the parts of a jig-saw puzzle.

When Small approached roomette A, he could see through the open curtain on the door that defendant was seated alone in the roomette. Small was in plainclothes and carried a gun concealed in a fannypack. He displayed his badge through the door window and asked defendant "May I talk to you?" Defendant unlocked the door and motioned for Small to enter the roomette. Once the door was opened, Small identified himself as a police officer and again asked if he could speak to defendant. Defendant agreed and asked Small to sit. However, Small at all times remained standing peering down on defendant, who remained seated, through the ensuing conversation. The testimony of Small and of defendant differed as to where Small stood in the roomette and whether the door were closed. Small testified that he stood by the sink and the door remained opened. Defendant testified that Small closed the door and stood with his back to the door. Under either scenario, the questioning that followed took place when defendant was alone in a small roomette with a police officer who asked direct, pointed questions that focused on defendant's activities without any other persons in close proximity. At no time did Small advise defendant that he did not have to talk to Small, that he could terminate their meeting or that he did not have to consent to a search of his luggage.

Defendant is 5 feet 10 inches tall and weighed 165 pounds; Small, alas, is smaller.

In response to Small's questions, defendant related that he had boarded in San Bernardino, California and was headed to Chicago to go fishing. Small believed the San Bernardino origin to be suspicious because in his experience San Bernardino was an origination point for marijuana, in particular. He believed the fishing story to be fishy because Small knew Kelly had previously told the train attendants he was taking books to his brother in Chicago.

Next, Small asked to see defendant's ticket and identification. Defendant provided a ticket issued to a "Martin Kelly"

and a California driver's license issued to a "Martin Kelly Miller." Defendant explained that the difference resulted from an Amtrak employee's error when issuing the ticket. (At this moment, Small did not know what name was on the footlocker in the common luggage area which the attendants had stated belonged to defendant.)

At this point in the conversation Small told defendant that he worked a drug interdiction program and was looking for people carrying drugs on Amtrak. Small's next question was whether defendant was carrying drugs to which defendant responded that he was not.[16]

After the focused question about whether defendant was carrying drugs, Small asked defendant what luggage he had. Defendant responded that the large bag and the American Tourister suitcase with him in the roomette were his only luggage.[17] Defendant then declined Small's request to search the two pieces of luggage in his room and Small left the roomette.

In his testimony Small admitted that, based on what he had developed by this time, he had insufficient information to detain defendant.

After leaving defendant's roomette, Small went to the common luggage area to examine the footlocker and discovered it had a name tag reading "Martin Kelly." This was significant to Small because defendant had just laid out a story that the only reason his ticket was issued in the name "Martin Kelly" instead of "Martin Kelly Miller" was because of an Amtrak employee's mistake. Another suspicious feature of the footlocker was the San Die-

go address on it since Kelly's driver's license listed a Santa Cruz, California address. Hence, by this time, Small was aware that Kelly had not claimed the footlocker as a part of his luggage and Small was aware of two different names and addresses for defendant.

Small remained on the train as it headed for the next stop, Lamy, New Mexico. While still on the train, Small contacted the Amtrak ticket office in Albuquerque, New Mexico and learned that defendant had made his reservation on May 29, 1990 and had purchased his ticket on May 30, 1990 with cash, the day before departure. Small had no further contact with defendant until the train was about 20 miles away from Lamy, at which time Small went back to defendant's roomette, knocked on the door, showed his badge, identified himself as a police officer and again asked to talk to defendant. Both Small and defendant testified that, although Small entered and was alone with defendant in the roomette, this time the door to the roomette remained opened.

Small began to interrogate defendant further. While questioning defendant, Small picked up and shook a box which had been located on the upper berth in the roomette and heard what sounded like a scale inside. When Small mentioned the footlocker and what he had seen on it to defendant, he observed that defendant exhibited an excited reaction. Small thereupon informed defendant, at 6:11 p.m., that Small was going to take defendant's luggage and footlocker to be sniffed by a trained narcotics detecting dog. With the

---

**16.** Before the Grand Jury, Small had testified that he had asked defendant if he was carrying narcotics. At the suppression hearing, Small testified that he believed he never asked defendant that specific question. However, defendant testified that indeed Small did ask him if he was carrying any narcotics. I believe the version given to the Grand Jury and find it to be factual.

**17.** Defendant testified that when Small asked whether the items in his room were his only "luggage", defendant did not think that Small was inquiring about a "footlocker"; defendant considered "luggage" to mean things in the na-

ture of the suitcase and bag in his room, but not to include footlockers. Consistent with the analyses in *Ward, Bloom* and *Hall* about what innocent travelers may do or think, one would have to concede that an innocent traveler might use the word "luggage" in the same way defendant testified he did and define it to include suitcases and bags, but not footlockers. Consequently, I do not attribute much weight to the fact that defendant failed to mention his footlocker when asked whether the suitcase and bag in his room comprised his only luggage even if this had occurred before Small seized defendant. *See* discussion *infra*.

assistance of the train attendant, Small seized the luggage and box in defendant's roomette and the footlocker when the train stopped in Lamy at 6:25 p.m. Small then drove the luggage, box and footlocker to the state penitentiary where a canine handler placed the luggage and footlocker in a kennel with three trained drug sniffing dogs, two of which alerted to contraband. Subsequently, Small drove to Albuquerque, New Mexico and obtained a federal search warrant after which he opened the luggage, footlocker and box at approximately 11:30 p.m. He discovered 86.1 pounds of marijuana in the footlocker and a scale in the box.

Defendant worked as a traveling salesman. Defendant testified that he had been arrested previously but that no one had advised him of his constitutional rights in connection with that arrest. Further, defendant testified that when Small first came to his roomette and began to question him, defendant was under the impression that he could not leave and that he was not free to decline to answer Small's questions. Defendant was beaten by a police officer when he was 16 years of age and he fears police officers. Defendant believed that Small would not leave unless and until defendant answered Small's questions. The second time Small came to defendant's roomette, defendant was terrified, especially since Small's demeanor had changed and he was much more aggressive.

In view of the foregoing facts, I conclude that Small seized the defendant without reasonable suspicion when Small first approached defendant in roomette A and asked him potentially incriminating questions. Under *Ward*, the seizure probably occurred as soon as Small inquired about defendant's point of origin and destination. As of that time, Small possessed the following information about defendant:

1. Reliable informants, senior train attendants, had told Small that in their opinion, the defendant was suspicious and not credible.

2. Defendant was traveling alone in a small roomette.

3. Defendant was eastbound from a narcotics source area headed for Chicago, a major drug distribution city.

4. The train attendants had informed Small that defendant had a very heavy footlocker located in the common luggage area and extremely heavy luggage and defendant said he was taking books to his brother in Chicago.

Based on the discussions in *Ward*, *Bloom*, and *Hall* about these factors being attributes of innocent travelers, they do not add up to reasonable suspicion of criminal activity as of the point Small began his focused questioning of defendant.

At the very latest, under the ruling in *Bloom*, Small seized defendant at the point when he told defendant he worked the drug interdiction program, looked for people traveling with drugs, and asked defendant if defendant was carrying any drugs. By this time, the only information Small had assembled in addition to that set forth above, was:

5. Defendant had boarded in San Bernardino, California which Small knew to be a major source city for marijuana. However, this adds nothing to the already mentioned factor that drug runners travel eastbound from Los Angeles, a major source area. San Bernardino is simply a part of that general region.

6. Defendant had told the train attendants that he had books that he was delivering to his brother in Chicago, but told Small he was going to Chicago to go fishing. The information defendant provided to the train attendants apparently was in response to a question about why his luggage was so heavy. The answer that defendant was headed for Chicago to go fishing was in response to Small's question asking why defendant was going to Chicago. These different answers to different questions are not inconsistent; innocent travelers may well have answered the two separate, distinct questions in the same way.

7. The train ticket showed the name "Martin Kelly" and the driver's license bore the name "Martin Kelly Miller." When asked about the discrepancy, defen-

dant provided a plausible explanation that an Amtrak employee had simply erred in omitting the last name "Miller." Although in hindsight it appears that defendant was lying to Small when he said this, Small at that moment possessed no information that would suggest defendant was being untruthful. It was only after defendant was seized under the *Bloom* analysis that Small realized on checking the name on the footlocker that defendant's story about the Amtrak employee making a mistake was probably at least a fib. I acknowledge and credit defendant's position, argued by his counsel with a remarkably serious, unflinching countenance, that train personnel can (the same as judges often do) err in their work. One would have to say that it is not inconceivable that a train company employee could inadvertently drop from an innocent traveler's ticket the last name of a moniker such as "Martin Kelly Miller." Moving counsel's argument a step forward and extrapolating a little, but not much, from the reasoning of *Ward, Bloom* and *Hall* about the nature of innocent travel, I find that if and when a hapless worker omits part of a name from a ticket, this would as likely happen to a blameless passenger as it would to one embarking on criminal pursuits.

Therefore, I am constrained to conclude that these additional factors, 5 through 7, even when added to the original factors 1 through 4, do not total reasonable suspicion of criminal activity under *Ward, Bloom* and *Hall.*

All of the additional suspicious information developed by Small is of no import because Small had already seized the defendant by the time he garnered it. This includes Small finding out that the footlocker had a different address from that shown on defendant's driver's license, discovering that defendant had purchased a one-way ticket for cash the day before departure without leaving a call-back number, realizing that defendant had told an additional lie about making his train reservation and buying his ticket a week to ten days earlier, and much later determining that defendant had lied about not being in possession of drugs.

Defendant never consented to a search of his luggage. Since Small seized defendant without reasonable suspicion, information subsequently developed from questioning defendant after he had been illegally seized cannot support detention of defendant's luggage, box and footlocker and the evidence discovered therein must, therefore, be suppressed.

Since my granting of defendant's motion to suppress will likely, as a practical matter, be dispositive of the case against him, I will not address defendant's motion to dismiss for alleged unreasonable delay in arresting him.

*United States of America v. Grigory Donskikh,* Cr. No. 92–275 JP

■ On January 16, 1992, Sam Candelaria and Kevin Small, experienced narcotics law enforcement officers, and U.S. Border Patrol Agent Hector Ochoa met Amtrak Train No. 4 eastbound from Los Angeles to Chicago when it stopped at the Albuquerque, New Mexico train station. On numerous prior occasions, Candelaria and other officers had interdicted drugs, and sometimes weapons, being carried on the eastbound Amtrak train. From his experience, Candelaria knew Los Angeles to be a source city for drugs. After the train arrived at the Albuquerque station, an Amtrak employee advised Candelaria that he believed it to be unusual that a couple traveling together under the name "Edward Martin" in a deluxe sleeper roomette (roomette 4 in car 431) had never left the roomette together. The Amtrak employee gave descriptions of the "Martins". Candelaria went to the public platform outside the train where he saw a man fitting the description of "Edward Martin". Small and Ochoa went to roomette 4 of car 431.

Candelaria approached defendant on the public platform. Approximately thirty other passengers were on the platform, some looking at the Indian jewelry for sale. Candelaria was dressed in plainclothes, not in a uniform, and carried a gun concealed in a fannypack. Candelaria displayed his badge, identified himself to defendant as a police officer and asked permission to

speak to him. Defendant responded in English, with an accent, that he would agree to talk to Candelaria.[18] Defendant stated that he had boarded the train in Los Angeles and was destined for New York. At Candelaria's request, defendant produced his ticket which showed a party of two traveling under the name "Edward Martin" and then a New York driver's license issued to "Edward Martin" with a photograph that, according to Candelaria, "looked like an earlier picture" and did not closely resemble defendant. Defendant retained possession of both his train ticket and his driver's license.

Next, Candelaria explained to defendant that he works with a drug interdiction program, speaks to train travelers eastbound from the west coast, and looks for persons with narcotics. Candelaria then asked if defendant was in a sleeper roomette or in the coach section and whether defendant had any luggage. Defendant said he was in a sleeper and had luggage. The testimony of Candelaria and defendant conflicts as to whether Candelaria requested and whether defendant gave consent while on the platform to a search of the luggage in defendant's sleeper roomette. I find that because of the language barrier and defendant's inability to comprehend all that is said to him in English, defendant did not understand that Candelaria was asking permission to search defendant's luggage while he and Candelaria were still on the public platform. Defendant and Candelaria began walking toward car 431 with defendant leading and Candelaria following.

Meanwhile, Small and Ochoa had gone to roomette 4 where Small knocked on the door which defendant's wife, Irina Richkevitch, opened. Small stood in the narrow doorway to the roomette, showed his badge and identified himself as a police officer to Ms. Richkevitch. Small was wearing plain-clothes and carried a gun concealed in a fannypack. Ochoa stood in the narrow train aisle immediately behind Small in Ms. Richkevitch's view. Ms. Richkevitch, who was not fully dressed, told Small in an extremely heavy accent that she was from Lithuania. Small turned to Ochoa and reported that Ms. Richkevitch was from Lithuania and appeared to be very nervous. Ochoa then stepped to the entrance to the roomette, identified himself as an immigration officer and asked Ms. Richkevitch her nationality and requested her passport and immigration documents. Ms. Richkevitch became highly agitated, a condition that soon changed to outright hysteria. Ms. Richkevitch, at the time, could speak and understand only a few words of English.[19] Ms. Richkevitch was able to comprehend that Ochoa was inquiring about her passport which happened to be in her husband's possession on the train platform. Consequently, Ms. Richkevitch began pounding on the train window attempting to attract her husband's attention. However, because the window was tinted, apparently defendant could not see her. Ms. Richkevitch became hysterical.

Defendant boarded the train followed by Candelaria and walked to roomette 4 where he encountered his less than fully clad wife, in an hysterical state, in the custody of Small and Ochoa. At this point, defendant and his wife went into their sleeper roomette, which is quite small even though designated "deluxe". The three law enforcement officers, the only other persons present, were in the narrow adjoining hallway surrounding the doorway to the roomette. Defendant rummaged through a bag and produced Lithuanian passports in his and his wife's names, Grigory Donskikh and Irina Richkevitch. Defendant also displayed his valid resident alien card, but none for his wife. Hence, Ochoa questioned defendant about his wife's status

18. At the hearing, defendant testified with a heavy accent and on several occasions questions had to be repeated for him because he had obvious difficulty understanding some English phraseology. Based on my observations of defendant, I believe, and so find, that defendant can converse in English in a limited way but does not fully understand all that is said to him in English.

19. Although by the time of the hearing Ms. Richkevitch had learned some additional English words, she still did not approach fluency in English and testified in the Russian language.

and eventually arrested her when Ochoa did not receive information or documents to his satisfaction. Agent Small testified that upon observing the documents, Agent Ochoa commented to Small that Ms. Richkevitch "was here illegally" and in Small's opinion she no longer was free to leave.

While defendant and his wife were in the confines of their sleeper roomette with the three officers immediately outside the room in the aisle, Candelaria explained that they work the drug interdiction program on the Amtrak train, that they talk to people traveling eastward from California, and that they look for people traveling with drugs. Immediately thereafter, Candelaria asked for consent to search the couple's luggage. Defendant understood Candelaria to say that "I have to see your luggage." Defendant and his wife stepped out of the roomette and into the cramped aisle. While doing this defendant made a sweeping gesture with his arm which the officers interpreted as consent to search. Candelaria then entered the roomette.

Candelaria searched the sleeper roomette and among other luggage found a nylon duffle bag hidden by the mattress, and not in plain or open view, on the upper berth. Inside the duffle bag, Candelaria found a paper grocery sack that contained a RPB Industries M10, .45 caliber machine gun, with a fully loaded clip. Defendant was arrested for possession of this weapon. Defendant's Exhibit A. The search unveiled no narcotics.

None of the law enforcement officers told defendant or his wife that they did not have to talk to the officers, that they could terminate the encounter at any time or that they did not have to consent to a search of their roomette or luggage.

Candelaria is 5 feet 7½ inches tall and weighs 150 pounds. Defendant is 6 feet 1 inch tall and by my observation at trial weighs over 200 pounds. Small and Ochoa are considerably smaller than defendant. Both defendant and his wife appeared to be in robust health at the time of the hearing and there was no evidence presented that either was suffering from an infirmity on January 16, 1992. On that date, defendant was 31 years old and his wife was 29.

Defendant testified that "I finished institute like mechanic in my country, and I know mechanics, but I manage a body shop." Defendant managed both a body shop and a car wash in New York before leaving on the trip to California.

Defendant seems to be very bright. He has a fecund imagination and obvious thespian talents.[20]

*Ward* and *Bloom* dictate a conclusion that defendant was detained after he and Candelaria returned to roomette 4 from the public platform.[21] Under the language in *Bloom* the officers seized defendant at the latest when, while defendant and his wife were in their small roomette with the three law enforcement officers immediately outside in the narrow aisle, Candelaria announced that they work the drug interdiction program, talk to people traveling eastward from California, and look for people

---

**20.** In a highly animated fashion Mr. Donskikh related, during his testimony, the following tale which, although most entertaining, in my judgment was purely fictional: Defendant took his wife from New York to California for some three or four weeks as a birthday gift for her. While in California he spent too much money and charged too much on his MasterCard. In the Los Angeles depot awaiting departure of his train back home to New York, defendant noticed a bag by the seats and upon touching it with his leg, he felt something inside. Naturally, he looked inside and discovered a gun. Although this shocked him for 30 seconds, his thoughts turned to a remembrance of things past—seeing on the wall of a New York police precinct office, where he had gone to report an accident, a notice of rewards paid for guns and

rifles without requiring an identification. He therefore took the machine gun with him on the return trip because he thought he could get a reward for it in New York which would help defray the expenses of his trip and "because I think it was all right." (Defendant's Exhibit A reflects that, at the time of his arrest, defendant said he had found the gun in the bathroom of the train station and that he was taking it back to New York to sell it because it was worth a lot of money in New York.)

**21.** From the beginning of her encounter with Small and Ochoa up to the time of her formal arrest on immigration violation charges, defendant's wife, Ms. Richkevitch, was under detention.

traveling with drugs and then immediately asked to search their luggage. The *Ward* opinion indicates that the detention of defendant likely occurred earlier at the time defendant was asked to produce passports and evidence of legal residence status for himself and his wife. At that moment, it would have appeared to a reasonable person in defendant's position that his wife was already under detention, that they were suspected of immigration violations, and that they were the focus of an ongoing inquiry. However, once defendant proved he was legally in the country, the officers lacked reasonable suspicion under *Ward, Bloom* and *Hall* to further detain defendant to investigate possible crimes other than immigration offenses.[22]

■ I also conclude that defendant did not clearly consent to a search of the luggage in his roomette while he and Candelaria were still on the public platform because defendant did not comprehend that Candelaria, at that point, was requesting the right to look through defendant's luggage.

Considering the circumstances that existed when defendant returned to his roomette—finding his hysterical, less than fully clothed wife, in the company of two other law enforcement officers and then being questioned rapidly, forcefully and directly in succession first about possible immigration violations and second about examining the contents of his luggage, after being told that the law enforcement officers looked for narcotics—I believe that defendant did not freely and voluntarily consent to a search of the luggage or the couple's sleeper roomette even though defendant may have made gestures which indicated to the officers that they could search. Initially, I decide that because of language difficulties, defendant did not consent to a search of his luggage because he interpreted Candelaria's statements to be a demand to see the luggage instead of a request to search it. Alternatively, I conclude that

even if defendant had an understanding that Candelaria was asking to see inside the luggage, defendant was in a situation such that he believed he had no choice but to permit a search, and he did not do so voluntarily. It does not make much sense to conclude that a reasonable husband in defendant's position, on seeing his wife under detention in the setting defendant observed upon returning to his roomette, would have a belief that he was free to terminate his personal encounter with the law enforcement officers, which necessarily would mean leaving his wife to fend for herself. Although I found defendant to be an accomplished actor, I did not size him up as a comedian, and I would not expect him, unlike Henny Youngman, to say "Take my wife—please!" Because of Ms. Richkevitch's emotional state and lack of understanding of English at the time Candelaria asked both defendant and his wife for consent to search their roomette, I also decide that Ms. Richkevitch did not voluntarily, intelligently or knowingly consent to a search of their luggage and roomette.

Since defendant was detained without reasonable suspicion following production of a valid resident alien card, and neither he nor his wife voluntarily consented to a search of their roomette before Candelaria discovered the hidden submachine gun, there is no alternative but to suppress that evidence.

*United States of America v. Bruce Bedrick,* Cr. No. 92–285 JP

■ On May 21, 1992 prior to the arrival in Albuquerque of Amtrak Train No. 4 eastbound from Los Angeles, DEA Agent Kevin Small, an experienced drug enforcement officer, received information from a train employee, known to Small to be a reliable informant, that there was a train passenger Small might want to "check out". The train employee relayed that the passenger was traveling under the name of "Bergman" and had purchased with cash a one-way ticket from Flagstaff to Syracuse the day before departure. Small estimated

---

**22.** The government did not raise the argument that defendant's continued detention was legal on the ground that he was under suspicion of harboring an illegal alien, probably because the officers were intent on searching for contraband and not further investigating the validity of defendant's marriage.

that in the preceding five years he had arrested 100 to 110 drug couriers, approximately eighty percent of whom had purchased one way tickets with cash and one hundred percent of whom had purchased the ticket within two days of departure. Small knew that Flagstaff was not a source city for drugs, but he considered defendant's boarding there to be significant because Flagstaff was the location in the Arizona area which afforded, daily, the quickest travel by train eastbound to Chicago. In Small's estimate approximately 50 of the 110 drug couriers Small had arrested had boarded in Flagstaff.

Small received a description of defendant and the number of the roomette (roomette 1, car 431) in which he was traveling. When the train stopped in Albuquerque, Small, who was dressed in plainclothes with his weapon and handcuffs concealed in a fannypack, failed to locate defendant in his compartment.[23] Small returned to the public platform and waited next to the exit door where, with the aid of a train employee, (presumably the "reliable informant"), Small located defendant descending the train steps to the platform.[24] Immediately after defendant deboarded and stepped onto the platform, Small approached, displayed his badge and asked to speak with defendant who consented. Several other people were in the area at this time.

Small never informed defendant, either on the platform or later on board the train, that he did not have to speak with Small, that he could terminate the encounter at any time or that defendant did not have to consent to a search of his luggage or a sniff of the luggage by a trained dog.

While on the platform Small inquired about defendant's destination and where he had boarded the train. Defendant said he was traveling to Syracuse and had boarded the train at Tucson. Small then asked defendant whether he had his ticket with him. Defendant responded that the ticket was in his room and that he would get it. Defendant did not ask or invite Small to accompany him to his roomette, but Small nonetheless followed at defendant's heels to his compartment where Small "peeked" inside. Defendant retrieved his ticket from a bag in his roomette and closed the door to his roomette behind him.

The ensuing conversation took place in the hallway immediately outside defendant's roomette with Small at times partly in the roomette across the hall from defendant's which Small described as "unoccupied." Small testified that the hallway between the two roomettes is approximately two feet wide and that Small was approximately three feet from defendant throughout the encounter. Car 431 has only private roomettes, such as defendant's. There are no public seating areas in the car.

No testimony was offered concerning the relative sizes of Small and defendant, but by observation I note that defendant is of slight physique and probably somewhat smaller than Small. There was no evidence that defendant, at the time of the encounter, was suffering from any infirmities.

While Small was the only agent visible to defendant prior to the appearance of the dog handler, Agent Candelaria was waiting "down the hall." Defendant testified that Small informed him soon after arrival at defendant's roomette, that Small's partner was present and that when defendant asked "where", defendant heard a voice say "here" and saw an arm wave from the confines of a compartment down the hall. However, the tape recording of the conversation, government's Exhibit 1, does not include this exchange at the point defendant testified it occurred. Since the tape does not appear to have been altered I reject defendant's testimony that Agent Candelaria's presence and whereabouts were revealed to him at such an early point in the encounter. Rather, from the transcript of the conversation it appears that

---

**23.** At this point Small was accompanied by Agent Sam Candelaria, also an experienced drug enforcement officer and also dressed in plainclothes.

**24.** Defendant testified that as he was descending the stairs he saw Small point at him and overheard Small ask the train porter "is that the guy?"

Candelaria's presence was made known following arrival of the dog handler when Small stated "That's my partner right back there in the next room." Accordingly, I find that prior to the arrival of the dog handler, which was subsequent to the seizure of defendant's bags, defendant was alone with Agent Small and no other officer was visible or "showed himself" to defendant. No other passengers were in the vicinity of defendant and Small during their conversation in front of defendant's roomette; they remained alone until the dog handler arrived.

After reviewing defendant's ticket, which Small returned to defendant, Small questioned defendant further in a firm, assertive, rapid and direct manner; he asked whether defendant had a "picture ID", how long defendant had been in Arizona, how he got there and where he lived. Defendant responded that he didn't think he had a picture ID, that he had been in Arizona only a couple of days, that he lived in New York and that he had flown out to Arizona to visit a friend, but had to return because he had been notified by his parents that his cousin had leukemia. Despite these seemingly innocuous answers, Small was unrelenting and pressed on.[25]

Small next proceeded to inform defendant that he was with the DEA which had a problem with people coming from California and Arizona on the Amtrak trains with drugs in their luggage; Small then asked defendant point blank if he had "any drugs in ... [his] luggage today." Defendant responded "No."

After this exchange Small immediately tried to obtain defendant's permission to search his luggage. Defendant refused consent and asked Small why he was "being picked out." In response, Small simply pointed to the fact that defendant was traveling alone. Small did not give up seeking defendant's consent to search, which defendant again declined, and subsequently

Small asked defendant "[w]ould you mind if a narcotics dog smelled your bag?" Defendant asked "Why?" Small replied "Just to make sure there's nothing inside the bags." Defendant responded "You are picking me out of nowhere. That's not fair to me." Small pressed on, and after much hesitation, defendant reluctantly agreed to have a dog smell his bags. Defendant testified he felt at that point he had no choice—he either had to let Small search his bags or consent to a trained dog smelling the bags. A dog was brought to defendant's compartment where it eventually alerted to one of defendant's luggage pieces, in which Small discovered marijuana after Small obtained a search warrant.

While defendant's initial encounter with Small on the platform did not amount to a seizure, when Small, without an invitation, followed defendant to his private roomette and began asking defendant direct and pointed questions, the encounter escalated to an investigative detention for which there was no reasonable suspicion. Under the language of *Ward* this probably occurred when Small asked defendant for photographic identification. Although at this point defendant was not within the confines of his compartment, Small had identified himself as a police officer and had followed defendant uninvited back to his roomette which contained defendant's personal belongings and had continued to question him in the tight confines of the hallway of the train car which housed only private roomettes in a setting where no one else was present. In fact, the lack of space between Small and defendant may have accentuated defendant's feeling of constraint because they were standing in the narrow aisle very close together and not in defendant's roomette where there could have been more space between them. Within the confines of this "quasi-public" space it would have been apparent to a reasonable person in defendant's position

---

**25.** At the hearing, defendant admitted under oath that he had lied when he told Small that he was returning to New York because his cousin had leukemia and that he took the train because he would have been charged $800 if he had used his open return plane ticket. Defendant also admitted he was using as an alias the name of a friend. However, at the time defendant said this, Small had no independent information suggesting that defendant was being untruthful when uttering these prevarications.

that he was being singled out for questioning by a police officer who was positioned close to him and who said nothing about defendant's right not to speak or to end the encounter. When Small continued to press defendant with rapid, pointed questions and ultimately asked him directly whether he had "any drugs in [his] luggage", at that moment defendant unquestionably was seized under the ruling in *Bloom*.

Regardless of whether defendant was seized when Small requested photographic identification or shortly thereafter when Small asked defendant if he had drugs in his luggage, I find that Small lacked reasonable suspicion to subject defendant to an investigative detention at either point.

When Small asked defendant for a photographic identification Small knew only that defendant was traveling alone in a private roomette en route from Flagstaff to Syracuse, that he had paid cash for his one way ticket, and that the name on defendant's ticket was Lawrence Bergman. While defendant said that he "got on at Tucson" in response to Small's question of "where [he got] on the train at," defendant explained in his testimony that he may have been confused by the question and thought that Small desired to know his point of origin which indeed had been Tucson.[26] However, even if defendant did not have a plausible explanation for answering "Tucson" when Small knew for a fact that the truthful answer could only be Flagstaff, because the train originating in Tucson did not stop in Albuquerque, I find that under prevailing Tenth Circuit law, the facts known by Small prior to seizing defendant failed to establish the requisite reasonable suspicion.

At the point Small asked defendant whether he was transporting drugs, Small had discovered in addition to the facts laid out above that defendant did not "think" he had a photographic identification,[27] that defendant had been in Arizona for two days visiting a friend and had been called back by his parents because a cousin was ill, and that he flew to Arizona on a round trip open return ticket which would be more expensive to use for return than train travel. Here again, under prevailing Tenth Circuit law, Small lacked sufficient factual information, including untrue statements known by Small to be lies, to establish the necessary reasonable suspicion to subject defendant to an investigative detention. Accordingly, because Small seized defendant without reasonable suspicion, any subsequent statements by defendant were the tainted fruit of the unlawful seizure of defendant's person. These statements cannot then be used to support a subsequent seizure of defendant's luggage.

However, the lack of reasonable suspicion for defendant's detention does not end the inquiry in this case. I must still determine whether, despite the lack of reasonable suspicion for his detention, defendant nevertheless voluntarily consented to the subsequent taking of his luggage and its examination by the drug sniffing dog.

■ Under the totality of the circumstances I find that defendant's consent to the holding of his luggage for a dog sniff was not voluntary. The government failed to provide clear and positive testimony that defendant's consent was "unequivocable and specific and freely given" and that the consent was given without duress or coercion. In regard to Small changing the questioning from asking for consent to search, which defendant repeatedly refused, to asking to have a dog smell defen-

---

**26.** Government Exhibit 1–A, a transcript of the tape recorded conversation between Small and defendant, erroneously indicates that Small asked defendant twice where he got on the train and that defendant twice responded "Tucson." The tape recording discloses that Small actually asked defendant only one time where he got on the train and defendant responded only once.

**27.** In his testimony Small seemed to attribute significance to the fact that defendant indicated on the way to his roomette that he had his "ID on [him]" but after showing Small his ticket defendant responded "I don't think so" to Small's question of "Okay Lawrence did you have anything with a picture ID on it at all?" Defendant had indicated that he possessed an "ID", not necessarily a "picture ID," and his response of "I don't think so" to Small's inquiry is not per se inconsistent with his previous statement, and certainly does not give rise to a suspicion that criminal activity was afoot.

dant's bags, defendant testified that at that point he felt trapped and that he by then felt he had no choice but to consent either to Small searching his bags or to a dog smelling them. Defendant expressed many times to Small that he felt picked "out of nowhere" yet Small forged ahead with his questioning and requests for consent offering defendant as an explanation only the fact that defendant was traveling alone.

Moreover, the close temporal proximity of defendant's unlawful detention, the lack of any intervening circumstances between the detention and the consent, and the fact that the purpose of defendant's illegal detention (to find drugs) was directly related to his subsequent consent to detain his luggage for a dog sniff, indicate that defendant's consent was tainted by his unlawful detention.[28] Accordingly, the contraband discovered as a result of defendant grudgingly agreeing to let Small hold his luggage for a canine sniff must be suppressed.

*United States of America v. Carno Ian Payne*, Cr. No. 92–292 JP

■ On May 29, 1992, Sam Candelaria, an experienced narcotics law enforcement officer working with the DEA Task Force, met Amtrak Train No. 4 en route from Los Angeles, California eastbound for Chicago at the Albuquerque, New Mexico station. Prior to the arrival of Amtrak Train No. 4, Candelaria had checked its manifest and had made telephone calls to obtain additional information. Candelaria became interested in defendant because the information Candelaria derived from the manifest and the calls reflected that defendant (1) had purchased a one-way ticket (which in Candelaria's experience was typical of drug couriers), (2) had paid cash for the ticket (in Candelaria's experience drug traffickers usually pay cash), (3) had rented a roomette (in Candelaria's experience, traffickers prefer the privacy of a roomette), (4) had purchased the ticket the day of travel (in Candelaria's experience it is common for drug traffickers to buy their tickets on or shortly before the day of travel) and (5) had begun his travel in Los Angeles (which Candelaria knew to be a source city for narcotics). In addition, after the train had stopped in Albuquerque, but before he first encountered defendant, Candelaria had gone by room 13 in car 431, which Candelaria knew from the manifest to be the roomette reserved by defendant, and had observed a brand new suitcase in the roomette. In Candelaria's experience, drug couriers often use new suitcases to carry narcotics.[29]

After walking by roomette 13, Candelaria asked a train attendant if the passenger who reserved that room had made the trip and the attendant pointed to defendant who was standing on a platform in an open public area outside of the train. Other people were milling around the area. Candelaria walked up to defendant, showed defendant his badge, stated he was with the Albuquerque Police Department, and asked if he could speak to defendant. Defendant replied "sure". Candelaria then asked defendant his destination, his point of origin, his name, and whether he could look at defendant's train ticket. Defendant handed Candelaria his ticket; Candelaria inspected it and returned it to defendant. Candelaria then asked defendant if he had anything with his name "Payne" on it. Defendant supplied a picture identification showing that he was employed by McDonnell Douglas; Candelaria looked at it and gave it back to defendant.

While on the platform, defendant did not give his driver's license to Candelaria; the

---

**28.** While Small's violation of defendant's Fourth Amendment rights may not have been "flagrant", Small never made clear to defendant that he could terminate the encounter, refuse a search and/or detention of his bags or retract his consent once given.

**29.** In addition, before the train had arrived in Albuquerque, Candelaria had dialed a call-back number left at the time defendant made his train reservation. A female answered the phone and told Candelaria, in response to his questions, that defendant was not there and she did not know when he would return. Candelaria included this fact in a police report he later prepared but at the hearing on the motion to suppress, Candelaria did not mention this fact as one arousing his suspicions. Hence, the phone call seems to have played no part in Candelaria's decision to speak to defendant.

driver's license was in defendant's wallet which was in a backpack in defendant's roomette. The backpack also contained defendant's resident alien card, business cards and a checkbook, none of which Candelaria had in his possession prior to discovery of the contraband.

Next, while still on the platform, Candelaria asked whether defendant's trip was for business or vacation and defendant responded that he was going to New York and then Miami to see if he could work for McDonnell Douglas there, because they were cutting back on their work force in California. He had been employed by McDonnell Douglas in Los Angeles for four years. Candelaria advised defendant that he worked a drug interdiction program and talked to people daily on the train from California, looking for persons traveling with narcotics. Candelaria then immediately asked defendant if he would mind if they went to his room on the train and defendant responded "OK". Defendant's Exhibit A. They then proceeded from the platform onto the train, and walked toward defendant's roomette with defendant leading the way. As they proceeded toward, and after they arrived at defendant's roomette, other people were in the area and their voices can be heard on government's Exhibit 1, the tape recording of the conversation.

When they arrived at roomette 13, defendant stood with one foot inside the roomette and his other foot in the aisle. Candelaria stood in the aisle behind defendant. Candelaria asked if the backpack and the new suitcase visible in the roomette belonged to defendant who indicated they did. The following conversation then ensued:

> Candelaria: OK. Would you voluntarily consent for me to search your luggage, Mr. Payne? Like I said is what we do is we work a drug interdiction program.
>
> Defendant: Sure.
>
> Candelaria: Looking for persons travelling with narcotics.
>
> Defendant: Sure.
>
> Candelaria: Any problem with me?

> Defendant: No.

Government's Exhibit 1.

Candelaria then asked defendant to begin with the large suitcase and said they would go through the small one next. Defendant fumbled in his pocket for his keys, hesitated removing the keys, and eventually opened the hard-sided large suitcase. The large suitcase was on the upper berth. As defendant lifted the upper part of the suitcase approximately six inches, a cardboard separator fell downward exposing two bundles wrapped in plastic, which Candelaria, from his experience, believed was contraband because of the way it was wrapped. Candelaria arrested defendant, and later determined that the bundles contained marijuana.

Candelaria never told defendant that he did not have to talk to Candelaria, that he could terminate the conversation or the encounter at any time, or that he could refuse a search of his luggage. Candelaria and defendant spoke at all times in normal voices. On the platform and up to the time defendant hesitated in extracting the keys from his pocket, he never appeared to be nervous; he was always calm and answered questions directly without indicating that he had anything to hide.

Defendant is a resident alien who had lived in Los Angeles, California for at least four years where he worked for McDonnell Douglas. He attended Long Beach City College and after two years received a FAA license related to his work with McDonnell Douglas. He also received a pilot's license after an additional year of study. He took other courses for an associate's degree in aeronautical engineering and was only one course short of acquiring that degree. Counsel did not elicit defendant's nationality. He was articulate in English and testified without an accent.

After listening several times to the tape recording of the conversation, government's Exhibit 1, transcripts of which were admitted into evidence as government's Exhibit 1A and defendant's Exhibit A (which do not differ in material respects), and considering defendant's testimony about his observation of Candelaria's hands through-

out the encounter, I find that defendant's testimony about parts of the conversation being omitted from the tape recording and transcripts is not credible.

Although the relative sizes of Candelaria and defendant were not stated on the record, by observation I note and find that defendant is a little taller and heavier than Candelaria and they appear to be about the same age. There was no evidence that defendant, on May 29, 1992, was suffering from any infirmities.

Although the encounter on the public train platform was consensual, I conclude that under the facts defendant did not during the conversation on the platform consent to a search of his train roomette or his luggage. While on the platform, Candelaria never asked to search defendant's luggage or his roomette. He merely asked if defendant would mind if they went to his room to which defendant agreed.

Next, I conclude that the facts considered in the light of *Ward* and *Bloom* show that defendant was seized by Candelaria at defendant's roomette prior to defendant opening his luggage. When they got to roomette 13, it was on a car with private compartments, without anyone else in the immediate proximity of defendant and Candelaria. Candelaria stood immediately adjacent to defendant just outside the door of defendant's roomette and defendant stood partially inside and partially outside of the roomette. Candelaria never advised defendant that he could terminate the encounter and did not have to consent to a search of his roomette or luggage. In this setting, defendant became seized under both the *Ward* and the *Bloom* analyses at the same point—when Candelaria asked to search defendant's luggage, saying that he works a drug interdiction program, because under these circumstances, a reasonable person would not have felt free to end the encounter or not to answer Candelaria's questions. At the moment Candelaria seized defendant, Candelaria did not have a reasonable suspicion that defendant was involved in criminal activity.

In addition to the matters which, from Candelaria's experience he associated with drug couriers—eastbound traveler from Los Angeles who purchased a one-way ticket for a roomette with cash the day before travel, all of which *Ward, Bloom,* and *Hall* indicate are of no particular significance in determining whether reasonable suspicion exists—Candelaria testified that he was suspicious of defendant appearing to have a new suitcase. (The government presented no evidence concerning Candelaria being suspicious about the information he gathered from calling the call-back number.)

Although Candelaria associated defendant's new suitcase with drug couriers because Candelaria often had seen them use new suitcases to carry narcotics, innocent travelers also use suitcases which appear to be new. This is closely analogous to drug couriers transporting heavy luggage which the Tenth Circuit noted in *Hall* could not be a factor adding much toward a sum that would equal reasonable suspicion of criminal conduct since many innocent travelers have heavy luggage. This is also analogous to *Ward* where the court attributed little or no weight to the type of luggage defendant was carrying, even though the officer considered it to be suspicious. Hence, as suggested by *Hall* and *Ward,* I decline to give much significance to the fact that defendant's suitcase appeared to be new. The new suitcase, when added to the other factors to which the Tenth Circuit attributes minimal significance, still does not equate to reasonable suspicion that criminal activity was occurring.

This leads to two questions regarding defendant's alleged consent: (1) Did defendant while at roomette 13 consent to a search of his luggage? and (2) If defendant did give consent, was it voluntary? First, I conclude that defendant did not clearly, unequivocally, specifically and freely consent to a search of his luggage by saying "Sure" because he was as likely acknowledging Candelaria's statement that he works a drug interdiction program, which was made immediately before the "Sure" response, as defendant was affirmatively answering Candelaria's request for consent to search. Interestingly, de-

fendant made the identical statement "Sure" in response to the next thing Candelaria said, which was Candelaria's repeating that he was looking for persons traveling with narcotics. Candelaria's next question "Any problem with me?" could be interpreted any number of ways, including whether Candelaria gave the impression of being personally offensive; it does not appear to be a repetition of Candelaria asking for consent.

Alternatively, even if defendant's "Sure" responses to Candelaria's ambiguous questions and/or statements could be construed as indicating a consent to search, I now decide that the government did not meet its burden of proving such consent was voluntary since there was no break in the causal connection between the illegal detention and the consent. The alleged consent occurred within a few seconds of Candelaria's seizure of defendant, with nothing intervening. Candelaria seized defendant for the purpose of determining whether he was carrying drugs; this was directly related to the alleged consent. Thus, defendant's alleged consent is tainted by the immediately preceding unlawful detention. The government's proof did not meet the higher burden required in this situation. Consequently, the marijuana discovered in defendant's luggage must be suppressed.

*United States of America v. Santana Romero Dottery*, Cr. No. 92–343 JP

■ On July 2, 1992, Narcotics Task Force Officer Sam Candelaria, pursuant to his normal activities while working the drug interdiction program at the Albuquerque train station, checked the manifest of the eastbound Amtrak Train No. 4 for travelers who fit the task force's drug courier profile. In Candelaria's experience, drug couriers usually: (1) travel alone; (2) pay for the ticket with cash to avoid giving identification or establishing a paper trail;

(3) buy the ticket one to three days prior to travel because couriers cannot plan ahead since drug transactions are not consummated well in advance and couriers must deal with indefinite time schedules; (4) leave a "bad" call-back number to avoid tracing; (5) rent a private sleeper compartment so the courier will have room to keep luggage containing contraband in privacy; (6) travel only one way on the train because it is slower; and (7) travel from Los Angeles, a known "source city" for drugs to the eastern part of the country by train, since there are fewer police and security checks at train stations and on trains than at airports and on airplanes.

Candelaria has an administrative warrant he uses to get copies of the train manifests. From the manifest for eastbound Train No. 4 arriving in Albuquerque on July 2, 1992, and from speaking to Amtrak employees at the ticket counter, Candelaria understood that defendant had purchased, one day prior to travel, a one-way cash ticket for $641 from Los Angeles to Detroit, a known distribution point for drugs. Candelaria also knew from the manifest that defendant had rented the handicap sleeper compartment and that he was traveling alone. Upon dialing the call-back number which defendant had left at the time of ticket purchase, Candelaria received a recording stating that the number had been disconnected. According to Candelaria, defendant was the only individual on the manifest who had purchased a one-way cash ticket the day before travel. Based on this information, Candelaria decided to approach defendant when the train arrived at the Albuquerque train station.[30]

When Train No. 4 pulled into the Albuquerque station on July 2, 1992 at 2:39 p.m., Candelaria asked the train attendant if the passenger in the handicap compartment was aboard. The attendant informed Candelaria that, in response to a request by

**30.** Candelaria admitted on cross-examination that there was nothing suspicious about someone who is spending three nights on a train renting a sleeper car in order to have a place to sleep. Candelaria further stated that there was nothing unusual about people traveling alone in sleeping compartments. In fact, on the train on which defendant was traveling, 14 out of 37 people in sleeper compartments were traveling alone. Candelaria also testified that it would be unlikely that someone younger than 21 or 22 has a credit card; thus, cash would be a young person's most usual way of buying a ticket since checks are not accepted in payment of Amtrak train tickets from people under 65.

train personnel, the occupant of the handicap compartment had moved to roomette 8 of car 431 on the second floor in order to allow an elderly couple to occupy the handicap room on the first floor. Candelaria walked down the aisle of the economy compartments on car 431 and saw defendant standing by roomette 8.[31]

Candelaria walked past roomette 8 in order to engage his tape recorder, and while doing so Candelaria was able to observe that the upper sleeper berth in the roomette was in a lowered position with luggage on top of it. Upon returning to roomette 8, Candelaria, who was in plainclothes with a concealed weapon, found the door closed and the curtain open. Defendant was sitting alone inside the roomette on the left side and Candelaria stood in the narrow aisle to the left side of the door, on the same side as defendant. This roomette is 81 inches long and 46 inches wide. The doorway is 23 inches wide, as is the hallway in which Candelaria was standing. Candelaria knocked on the door, identified himself as a police officer and displayed his badge. Defendant opened the door. At this time, a second law enforcement officer, James Torres, was down the hallway out of defendant's view. A recorded conversation between Candelaria and defendant ensued. No other passengers were in the vicinity during the conversation.

In response to Candelaria's questions, defendant stated that he was going to Detroit and that he was traveling alone. Candelaria asked to look at defendant's train ticket and as defendant handed him the ticket, Candelaria asked if he had been planning the trip for a long time. Defendant responded that he decided to take the trip "all of a sudden." Candelaria testified that he found it suspicious that defendant suddenly decided that he wanted to go home to Michigan for the Fourth of July holiday

because a train trip from Los Angeles would take three days and be slower than other methods of travel. Candelaria returned the ticket to defendant a few seconds later. In response to further questioning by Candelaria, defendant stated that he had been in Los Angeles for a two weeks vacation visiting his uncle and that he had traveled to L.A. by bus. Candelaria asked to see some identification which he examined briefly. Candelaria found no information in conflict with what he already knew and he returned the Michigan I.D. card to defendant.

Next, Candelaria told defendant that he works the drug interdiction program on Amtrak and talks to people traveling on the Amtrak train from California going "back east ah, cities like ah Detroit and also going to Michigan and ah Chicago traveling with narcotics." Candelaria then immediately proceeded to ask defendant if certain luggage belonged to him and promptly asked if Candelaria could search it.

When Candelaria first asked defendant if he would voluntarily consent to a search of his luggage, defendant responded, "Well, what's the problem?" According to Candelaria, as he proceeded to explain again to defendant that he works a drug interdiction program, defendant reached over some of his luggage and pulled toward him a brown bag, which was the item of luggage furthest away. Defendant's three pieces of luggage had been in a row on the upper berth with a large black bag closest to him, a black duffle bag next and the brown bag which defendant moved most distant. Candelaria testified that defendant pushed the large black bag and the black duffle bag away from him toward the wall and held on to the brown bag. Candelaria found this to be suspicious since it indicat-

---

**31.** Candelaria testified that defendant was standing with a young boy and this raised his suspicion since drug couriers often travel with others but room separately. However, that defendant was initially seen standing with a young boy was not mentioned in the more than 5 pages of narrative in the police report which Candelaria prepared; in fact, the report indicates that when Candelaria first saw the defen-

dant, he was standing alone. Defendant testified that he did not speak to the young boy until after the police had taken his luggage when the boy approached him and asked what had happened. Given the language in the police report and the testimony at the hearing, I find that defendant was alone when Candelaria first saw him.

ed that defendant was trying to hide something contained in the black luggage.

Candelaria continued to ask defendant questions and eventually defendant asked, "Now what did you say you had to do now?" Candelaria testified that when defendant asked that question, he was holding the brown suitbag in his hand, off the berth. Candelaria responded that "I just ask ... if you would voluntarily consent for me to search your luggage." Defendant responded, "Oh, I don't have to do I?" and Candelaria explained, "No sir, not at all. The consent is totally up to you." At this point, defendant declined to have his bags searched and Candelaria asked "You really don't want to ... Mr. Dottery?" to which defendant gave a definitive, "No sir."

At this point defendant became aware of the presence of a second law enforcement officer, Agent Torres. While reading from a copy of defendant's train reservation, Candelaria asked defendant questions concerning the information defendant gave when he made his reservation. Defendant was trying to look at the copy of the reservation which Candelaria was holding and this also made Candelaria suspicious. Candelaria was interested in the home call-back number since he had already dialed it and found it had been disconnected. In response to Candelaria's reading the phone number from the reservation sheet, defendant said that he could not remember the California telephone call-back number he had left but eventually defendant gave a number which was the same as the number on the reservation sheet but for one digit.[32]

As Candelaria was asking about the call-back number, he waved to Officer Torres, who was down the aisle, and asked him to step "in here." Torres then approached the area of roomette 8.

At this point, Candelaria informed defendant that he was going to seize his three bags and subject them to a "narcotic sniffing dog." Neither Candelaria nor Torres entered defendant's roomette until after Candelaria informed defendant that his

luggage would be seized. No police officer ever threatened or touched defendant. However, Candelaria never told defendant that he had the right to refuse to speak to him and the right to terminate the encounter.

Candelaria took defendant's three pieces of luggage, and had them sniffed by a trained narcotics detecting dog, which alerted to the presence of contraband. Later, Candelaria opened the luggage after securing a search warrant thereupon discovering cocaine.

Defendant was 20 years of age in July of 1992. He lives with his grandparents in Saginaw, Michigan and he took the GED exam in August of 1992. He planned to enter college in the fall of 1992 on a basketball scholarship. Defendant testified that he answered Candelaria's questions because Candelaria is a police officer and defendant did not think that he could tell Candelaria "No." Defendant has never before been arrested and he has had no previous encounters with police. Defendant is six feet tall and weighed about 150 pounds; Candelaria is 5 feet 7 inches tall and also weighed 150 pounds.

I conclude, under the language of *Ward*, that Candelaria illegally seized defendant without reasonable suspicion when he first began to ask him potentially incriminating questions while defendant was in roomette 8. Under *Ward*, this probably occurred at the beginning of the conversation when Candelaria focused questioning on defendant's destination and status of singular travel, two features of the courier profile Candelaria used. According to *Ward*, *Bloom* and *Hall*, the information Candelaria gained about defendant from reading the train manifest and from talking to Amtrak personnel—factors numbered (1) through (7) set forth at the beginning of the discussion of this case—did not, as a matter of law, amount to a reasonable suspicion that criminal activity was afoot. This was the extent of Candelaria's knowledge when he began asking the focused questions.

32. Defendant's counsel suggested that the railroad employee who took the reservation incor- rectly recorded the call-back number, a not unheard of human failing.

Alternatively, I find that defendant was seized under the language of *Bloom* from the moment Candelaria said he works a drug interdiction program and talks to eastbound travelers who may be traveling with drugs and thereupon asked permission to search defendant's luggage. As of this moment, in addition to having knowledge of the courier profile factors (all of which the Tenth Circuit has stated in *Ward*, *Bloom* and *Hall* are consistent with innocent travel and therefore not indicative of criminal activity) Candelaria was suspicious of defendant's "sudden" decision to go home for the holidays, which is as consistent with innocent travel as is any one of the courier profile factors, which the Tenth Circuit equates to innocent travel.

At the suppression hearing, the Assistant United States Attorney agreed that Candelaria did not learn anything new upon questioning defendant except seeing him pull the brown bag towards himself and push the other bags away. However, this fact is irrelevant since, under *Ward* and *Bloom*, defendant had already been seized without reasonable suspicion before any movement of the luggage occurred. Defendant never consented to Candelaria's detaining his luggage. Since Candelaria took the luggage without consent or reasonable suspicion of criminal activity, the seizure was in violation of the Fourth Amendment and the contraband found inside the luggage must be suppressed.

*United States of America v. Adrian Keith Finnell,* Cr. No. 92–379 JP

■ On July 13, 1992, Officer Candelaria, an experienced member of the Albuquerque Metro Narcotics Task Force, reviewed the manifest for Amtrak Train 4 eastbound from Los Angeles. The name of "A. Jones" caught his eye and aroused his curiosity because this passenger was listed as traveling alone. Candelaria requested a printout of the reservation for "A. Jones" which revealed that "A. Jones" (1) had purchased a one-way ticket (in Candelaria's experience drug couriers commonly buy one-way tickets), (2) had paid cash (in Candelaria's experience drug couriers prefer to pay cash for their tickets to avoid leaving a paper trail and giving proof of identification), (3) had bought the ticket the day of departure (in Candelaria's experience drug couriers do not receive much notice of when their loads are ready for shipment and they want to possess the drugs for a limited time, so they make arrangements for train travel on short notice after learning when the contraband will be given to them for transport), (4) was eastbound from Los Angeles (which Candelaria knew to be a source city for drugs), (5) had reserved a roomette (which in Candelaria's experience drug couriers prefer for privacy although they are more expensive than coach fares),[33] and (6) had left no home call-back number when purchasing the ticket (which in Candelaria's experience is the mode of operation of drug couriers).

When the train arrived in Albuquerque at approximately 1:00 p.m. Candelaria proceeded to sleeper roomette 8 in car 431 which had been assigned to "A. Jones." Candelaria wore plainclothes and carried a weapon and handcuffs concealed in a fannypack. Candelaria was accompanied by Officer Garduno who remained "out of sight" about twenty to thirty feet away, in the hallway between car 431 and the next car, with a dog trained to detect narcotics.

---

**33.** Government's Exhibit 5 showed that from March 3, 1988 through September 3, 1992 DEA agents seized contraband from eighty-eight passengers on eastbound Amtrak Train No. 4 and westbound Amtrak Train No. 3. Candelaria testified that approximately eighty of these seizures occurred from Train No. 4 and that all of these seizures were from passengers occupying roomettes. However, I should note that the testimony in other cases reveals that not all passengers carrying contraband necessarily had the contraband with them in their roomettes. *See United States v. Miller,* Cr. No. 90–261 JP, *supra.* More-

over, Candelaria's testimony in this case implicitly indicated that only those passengers traveling in roomettes were singled out for questioning. In *United States v. Dottery,* Cr. No. 92–343 JP *infra,* Candelaria testified explicitly as to this investigative technique. Accordingly, Candelaria's testimony that 100% of the seizures in a given time period were from persons traveling in roomettes can be accorded little if any weight. The DEA agents working the Amtrak trains simply do not appear to investigate any passengers other than those traveling in such a fashion.

At one point in the conversation between Candelaria and defendant, Candelaria indicated that he had a dog waiting outside. However, there was no testimony as to whether defendant was ever aware that another officer was in fact "waiting" with the dog, although as noted below this may have been a reasonable conclusion.

There was no response to Candelaria's knock on the door. Candelaria returned to roomette 8 at approximately 1:32 p.m. and again knocked on the door. This time defendant pulled aside the curtains covering the window in the door. Candelaria pressed his Albuquerque police badge against the window, identified himself as an Albuquerque police officer and asked in rapid sequence "Could I speak to you for a second?" and "How is your trip going today so far?" [34]

Defendant opened the door to the compartment. Defendant's verbal response to Candelaria's request to speak with him is unclear as this question was immediately followed by Candelaria's second question of "[h]ow is your trip going today?". The tape recording reveals that defendant was not given time to answer the first question before Candelaria propounded the second. Thus, while defendant responded "[a]ll right" to Candelaria's compound inquiry, this reply may well have been a response to the second question concerning the quality of his trip and not an answer to the first concerning consent to talk. Regardless of which question defendant actually responded to, Candelaria's method of requesting consent to speak with defendant did not allow time for a considered response. In addition, and most importantly, at no time before or during the encounter did Candela-

ria explain to defendant that he did not have to speak with Candelaria, that he could terminate the conversation at any time or that defendant could refuse consent to search his luggage. [35]

Defendant remained seated on the small settee in the compartment for at least part of the ensuing conversation. Candelaria testified that he stood to "the side" of the small doorway and looked around the door frame at defendant to make eye contact during the conversation. Candelaria testified that this posture "inconvenienced" defendant, as defendant was then forced to lean forward in order to carry on the conversation. It appears that Candelaria's testimony was intended to clarify that he was not blocking the small doorway, the only exit from defendant's small private compartment. However, as noted below I find it difficult to visualize how Candelaria maintained this posture without standing at least partially in the narrow doorway during the encounter.

Defendant and Candelaria were alone together throughout the entire encounter with defendant remaining at all times within his small private roomette which was 6 feet 6 inches long and 3 feet 6 inches wide. Candelaria testified that he heard no other voices while he was alone with defendant and that no other persons passed by in the hallway. The government presented evidence that defendant was taller and heavier than Candelaria. There was no evidence that defendant was suffering from any infirmities at the time of the encounter. Throughout the conversation Candelaria maintained a normal tone of voice but questioned defendant in an authoritative and assertive manner. Defendant too main-

34. The substance of the conversation between defendant and Candelaria was obtained from a tape recording of that conversation. Government Exhibit 2. Transcripts of the conversation were also submitted as defendant's Exhibit A and government Exhibit 2–A which do not differ in any material respect.

35. The recording reveals that later in the conversation after Candelaria had informed defendant that he would seize defendant's bag without his consent, defendant responded affirmatively when Candelaria queried "[w]ell, I asked you for permission to speak to you...." How-

ever, by this point in the encounter, the recording indicates that Candelaria's attitude towards the defendant was domineering and that communication between the two had deteriorated. The recording shows that Candelaria interrupted defendant as defendant attempted to answer Candelaria's inquiry concerning defendant's prior consent to the conversation. Consequently, I find that this affirmative response by defendant is not confirmation that defendant had, in fact, voluntarily consented at the beginning of the conversation to talk to Candelaria.

tained a normal tone of voice and until the point his bag was seized without his consent, defendant was polite and soft-spoken. Defendant's voice on the tape does not indicate nervousness and Candelaria did not testify that defendant appeared nervous or hesitant.

In response to direct questions defendant informed Candelaria that he had boarded the train in Los Angeles and was en route to Kansas City to visit relatives. Candelaria also learned that defendant's ticket was in the name of "A. Jones" and that defendant had signed a meal voucher on the train in the name of "Andy Jones." After this short exchange defendant asked Candelaria "Well, what's the problem?" to which Candelaria responded "What I, ah, what we do is I work this train every day. And what we do is we talk to people traveling this train everyday." Defendant again asked "No problem is there?" and Candelaria indicated that there was "not a bit, not a bit" of a problem. Continued conversation revealed that defendant was planning a two week stay in Kansas City with his uncle, that his name was Adrian Finnell, and that his sister or cousin had purchased his ticket for him and put it in the purchaser's name because defendant did not have time to pay for it. At this point in the conversation Candelaria explained:

> Right. Mr. Finnell, what I do is I work the drug interdiction program here on the Amtrak. What we do, like I said, we talk to people traveling out of Los Angeles, going back east, the midwest, travelling [sic] with narcotics. Do you have any luggage in here, sir?

Government's Exhibit 2–A. In response to this information and question defendant indicated that he was traveling with one small bag which was in the compartment with him. Upon receiving this information and after confirming that defendant was planning to stay in Kansas City for two weeks, Candelaria again explained

> Mr. Finnell, like I said, what we do is work the drug interdiction program. We're looking for persons traveling with

narcotics. Would you voluntarily consent for me to search that bag, sir?

Government's Exhibit 2–A.

Defendant refused to consent to a search of his bag and over much verbal protest from. defendant, Candelaria seized defendant's bag and carried it to the lower deck where the waiting trained dog alerted to the bag. Defendant voluntarily accompanied Candelaria to the lower level for this procedure. Candelaria kept the bag in Albuquerque, obtained a warrant to search it, and discovered that it contained heroin. Defendant continued on the train to Las Vegas, New Mexico where he was arrested.

As a result of the physical circumstances in which Candelaria approached defendant and the failure to inform defendant that he could refuse or terminate the encounter, under the teaching of *Ward* I find that defendant was seized at the outset of the encounter when Candelaria first requested that defendant speak to him and defendant opened his roomette door in response to Candelaria's knock and display of his badge. Alternatively under *Ward* defendant was seized at least at the point Candelaria requested defendant produce an identification with defendant's name and subsequently stated, in response to defendant's direct question of "what's the problem", that he "worked the train everyday" and talked to people on the train everyday.

Under the holding in *Bloom* I find that defendant was seized at that point in the encounter where Candelaria informed defendant that

> [w]hat I do is I work the drug interdiction program here on the Amtrak ... we talk to people traveling out of Los Angeles going ... [to] the midwest, travelling [sic] with narcotics. Do you have any luggage in here, sir?

Government's Exhibit 2–A. Alternatively, under *Bloom* defendant was seized several moments later when Candelaria more pointedly stated

> Mr. Finnell, like I said, what we do is work the drug interdiction program. We're looking for persons traveling with

narcotics. Would you voluntarily consent for me to search that bag, sir? Government's Exhibit 2–A.

The following factors are determinative of my conclusions. Candelaria approached defendant who was alone in the confines of his small private train compartment. Although Candelaria was in plainclothes, he immediately identified himself as a police officer by pressing his badge against the window of the compartment. Given the physical layout of the train compartment and the fact that defendant remained seated throughout most of the interview, I find it difficult to understand how Candelaria carried on the conversation without at least partially standing in and blocking the doorway. Nonetheless, even if Candelaria were positioned in the manner he described, I conclude that his presence at the only narrow exit from defendant's compartment would readily contribute to the assessment of a reasonable person that he was not free to terminate the encounter. Moreover, Candelaria's posture, which allegedly "inconvenienced" defendant, may have contributed more to a reasonable person's discomfort and sense that the encounter was nonconsensual, than if Candelaria had assumed a normal stance in the doorway so that defendant was not forced to lean forward to speak with him.

Not only was defendant approached and questioned in his private compartment but here too, as in *Ward* and *Bloom*, no other persons passed by in the corridor or were known to be nearby. Defendant was completely alone with the officer. The nearest public space where other travelers may have been was the dining car which was located two complete cars away.

While alone with defendant, as in *Ward* and *Bloom*, Candelaria asked focused, potentially incriminating questions in an assertive, authoritative manner which would " 'heighten' the feeling that the person [being questioned] 'was the specific object of the officers' inquiry,' and lead a reasonable person to believe that he or she was less able to terminate the encounter." *Bloom*, 975 F.2d at 1454 (quoting *Ward* at 1532). Defendant was asked questions concerning

his destination, his time of arrival and his luggage. In addition, Candelaria made clear during the encounter that he was part of a drug interdiction program. While the differing discussions in *Ward* and *Bloom* concerning the nature of questioning which will implicate a seizure suggest that defendant was seized at different points during the encounter, the fact that Candelaria ultimately directly stated "We're looking for persons traveling with narcotics. Would you voluntarily consent for me to search that bag, sir?" requires a conclusion that defendant was seized at that moment, if he had not been seized earlier; and was thereafter subjected to an investigative detention.

Finally, as in *Ward* and *Bloom*, Candelaria never advised defendant that he did not have to speak to Candelaria or that he was free to terminate the encounter. Moreover, as discussed above, while Candelaria asked to speak with defendant, the recording of this conversation does not show that defendant clearly agreed to talk to Candelaria; instead it indicates that defendant was not given much of an opportunity to refuse this request as it was immediately followed by another question unrelated to consent before defendant responded.

Taking into account all of the factors outlined above, an analysis required under *Ward* and *Bloom*, I am compelled to conclude that the encounter between Candelaria and defendant was an investigative detention for which there must have been reasonable suspicion at the outset. Regardless of when defendant was seized during his encounter with Candelaria, there was no reasonable suspicion to support the seizure.

Candelaria testified that there were six factors which caused him to visit defendant's compartment in order to question him: (1) defendant paid cash for his ticket; (2) the ticket was purchased the same day of travel; (3) defendant was traveling alone; (4) defendant was traveling from Los Angeles to the midwest; (5) defendant was traveling in a private sleeper; and (6) defendant left no home call-back number when he purchased his ticket. If defen-

dant were seized at the outset, with only these factors known to Candelaria, Candelaria lacked reasonable suspicion of criminal activity. The Tenth Circuit has made clear that these factors alone cannot, as a matter of law, establish reasonable suspicion. Alternatively, if under *Ward,* defendant were seized at the point Candelaria requested defendant produce identification and/or several moments later at the point Candelaria explained his purpose on the train was to "work" the train and "talk" to people, Candelaria also lacked a basis for reasonable suspicion at that juncture. The only additional information Candelaria had received before the request for identification and/or Candelaria's explanation of his own presence on the train was that defendant was traveling to Kansas City to visit relatives and that defendant expected to arrive in Kansas City at 7:20 a.m.[36] This additional information does no more to establish reasonable suspicion than the factors known to Candelaria at the outset of the encounter.

At the point Candelaria informed defendant that he was with a drug interdiction program and asked defendant whether he had luggage, Candelaria knew that defendant was traveling to visit his uncle for two weeks and that the name on his ticket was not his own but rather was the name of a sister or cousin who had purchased the ticket for him.[37] Candelaria subsequently learned that defendant was traveling with one small bag which was the only additional information available to him prior to Candelaria's initial request to search defendant's bag and his statement that "We're looking for persons traveling with narcotics."[38]

In *Ward* the court held that a tip from a reliable source that defendant had purchased a one way ticket from Arizona to Kansas City, Missouri with cash and had reserved the largest private room available but was traveling alone, plus information that his ticket bore a name different from his own, was insufficient as a matter of law to establish reasonable suspicion. Similar facts in *Bloom* also precluded a finding of reasonable suspicion. There are no material additional or different facts present in this case which would cause, or even allow me to come to a different conclusion from those reached by the Tenth Circuit in *Ward* and *Bloom.*[39] Accordingly, I find that

**36.** Candelaria's initial explanation of his own presence on the train followed his request that the defendant produce identification. However, it appears from the transcript that either defendant did not produce identification at this point or Candelaria did not look at the identification and ascertain defendant's name until a later point as after several more questions Candelaria asked defendant "What is your name?" Thus, it was not until later in the conversation, after defendant was seized under the *Ward* analysis, when defendant told Candelaria his name in response to a direct question, that Candelaria was apprised that defendant's name was different than the name appearing on his ticket.

**37.** While the fact that defendant told Candelaria first that his "sister bought the ticket" for him and later that his "cousin ... paid for it", may have seemed suspicious to Candelaria, reference to the detail of the conversation between defendant and Candelaria shows that in both instances defendant indicates that "they had to put it in their name." Thus, the information relayed by defendant to Candelaria merely indicates that more than one other person assisted him in purchasing his ticket since he refers to his sister and cousin in the collective and plural. Under prevailing Tenth Circuit law this again is simply indicia of innocent travel and can not be used

here to establish the requisite reasonable suspicion.

**38.** In his testimony Candelaria appeared to place great weight on the fact that defendant carried only a small bag but had stated that he was planning a two week stay in Kansas City. Under the teachings of *Ward, Bloom* and *Hall* this factor cannot build a case for reasonable suspicion. In *Hall* the Tenth Circuit indicated that the fact that defendant's luggage was "very heavy" could not be used to support a finding of reasonable suspicion. Similarly, the fact that defendant was traveling with only one piece of luggage for a two week stay is simply another indication of innocent travel. This is especially true where, as here, it was the height of the summer season and only light clothing would be required either in Los Angeles (defendant's point of origin) or Kansas City (defendant's destination).

**39.** While defendant in *Ward* left a home call-back number, it had a Tucson prefix and defendant boarded the train in Flagstaff. The *Ward* court found such a discrepancy indicia of innocent travel and not support for reasonable suspicion. In this case defendant's failure to furnish a home call-back number is similarly insuffi-

Candelaria lacked reasonable suspicion to subject defendant to an investigative detention.

Because Candelaria seized defendant without reasonable suspicion any subsequent statements by defendant were the tainted fruit of the unlawful seizure of defendant's person. These statements cannot then, be used to support the subsequent seizure of defendant's bag and any evidence derived from this seizure must also be suppressed.

*United States of America v. Peter John Sola*, Cr. No. 92–378 JP

█ On July 24, 1992 Sam Candelaria, an experienced narcotics law enforcement officer working for the DEA Task Force, met Amtrak Train No. 4 en route from Los Angeles, California eastbound for Chicago at the Albuquerque, New Mexico train station. Prior to the arrival of Amtrak Train No. 4, Candelaria had checked the manifest for the sleeper compartments of the train.[40] Candelaria became interested in a passenger named Peter Sinclair because the manifest reflected that Sinclair had (1) purchased a one-way ticket to Chicago (in Candelaria's experience drug couriers fly to Los Angeles to pick up drugs, but ride a train while carrying drugs because of the lesser security on trains than on planes); (2) paid $500 cash for the ticket (in Candelaria's experience drug couriers usually pay cash);[41] (3) rented a sleeper roomette (in Candelaria's experience, traffickers prefer the privacy of a sleeper roomette where there is enough room to keep luggage in a private area); (4) purchased the ticket the day prior to the date of departure from Los Angeles (in Candelaria's experience it is common for drug traffickers to buy their tickets on or shortly before the day of travel); and (5) begun his travel in Los Angeles (which Candelaria knew to be a source city for narcotics).

In addition, Candelaria gleaned from the manifest that Peter Sinclair made the train reservation on July 22, 1992, the day before departure, and left a call-back number of 619–459–4461, extension 503. Candelaria placed a call to that number and discovered it was the telephone number of a Best Western Inn By the Sea at La Jolla, California. The person to whom Candelaria spoke advised that Peter Sinclair had checked into the Inn By the Sea on July 20 without a prior reservation, had paid cash, had checked out on July 21, and had given a home address of 810 North Wells, Chicago, Illinois, and a telephone number of (312) 296–0632.[42] Candelaria dialed the Chicago number, (312) 296–0632, and heard a recording which mentioned the names "Mike" and "Chuck".

Candelaria and his partner, James Torres, were on the public platform at the Albuquerque train station on July 24, 1992 when Amtrak Train No. 4 arrived. Both Candelaria and Detective Torres were dressed in plainclothes and carried weapons hidden in fannypacks. They watched passengers detrain, including defendant, who at that time they did not recognize as Peter Sinclair. Defendant testified that he had noticed Candelaria and Torres together on the platform.

Officer Torres boarded the train to see if anyone was in roomette 4. (The manifest had also disclosed that Peter Sinclair had reserved sleeper roomette 4, on the upper of the two levels of car 431, which was the last car on the train). After Torres entered the train car, defendant also got on board. Candelaria entered car 431 behind defen-

---

cient to establish reasonable suspicion. This is especially true here as defendant purchased his ticket the day of his departure and the utility of a call-back number for such purposes as confirming a reservation would have been greatly diminished.

**40.** Candelaria testified that he only checks the manifest for the sleeper cars because that is where he looks for drugs.

**41.** Amtrak does not accept checks from passengers under the age of 65. Those under 65 must

pay with a major credit card or cash. Defendant's Exhibit A. Defendant testified that he did not have a credit card and thus, he had to pay for his ticket with cash.

**42.** In fact, Candelaria was apparently given misinformation about the date of check-in and check-out at Inn By the Sea. Defendant's Exhibit J reflects a check-in date of July 21 and a check-out date of July 22.

dant and went up the stairs to the second level.

As Officer Torres went to check roomette 4, he noticed that defendant was standing in the aisle closing the curtains to roomette 4. Defendant looked at Torres and started walking down the aisle toward car 430. Candelaria then came to roomette 4 and Torres told him he thought that defendant, whom he had observed closing the curtains, was "our person." Torres then walked from car 431 into car 430, observed defendant standing in the middle of car 430 near the top of the stairwell, passed by defendant without speaking to him, and descended the stairwell, remaining at the bottom of the stairwell in a common luggage area. As Candelaria walked by roomette 4, Candelaria could see a large gray, hard-sided suitcase inside the roomette. Candelaria testified that in his experience, this seemed unusual because suitcases of that size normally are kept in the common luggage area due to the crowded nature of the room.

Candelaria went from car 431 into car 430 and saw defendant standing in the passageway of car 430, in a corner, which is formed by the landing at the top of the stairs and the aisle which joins the landing. Candelaria approached defendant at this corner where the passageway makes a 90 degree turn from the landing of the stairway into the aisle. The passageway is very narrow and the corner area is quite small.[43] During their conversation, defendant literally stood in the corner facing toward the stairwell and Candelaria faced defendant with the passageway behind Candelaria. People walking through the car would have had to turn sideways to pass by defendant and Candelaria.

At the beginning of the conversation between Candelaria and defendant other train passengers passed near them. Background voices can be heard on the tape recording of their conversation. Government's Exhibit 1. However, it is clear that other passengers merely passed by and no one stopped and remained close to Candelaria and defendant. There were no places in the narrow aisle or the landing of car 430 where anyone could be seated.

Candelaria first identified himself to defendant as an Albuquerque police officer. Although defendant could not see Torres at the foot of the stairwell, once Candelaria identified himself as a police officer, defendant believed that Torres also was a police officer and was in close proximity, even though out of sight.

After identifying himself as a police officer, Candelaria asked defendant's destination, where he had boarded, the reason for his trip to California, and whether he could look at defendant's train ticket. Defendant removed his ticket from his pants pocket and Candelaria inspected it.

Candelaria next asked defendant if he was from Chicago; defendant said he was and asked what the problem was. Candelaria said there was no problem but that he worked the Amtrak train and talked to people everyday. In response to Candelaria's request for something with defendant's name on it, defendant stated that he had nothing with him and that it was back in Chicago. Candelaria then asked defendant his name and defendant responded "Sinclair—Peter." When Candelaria asked what luggage defendant had, defendant responded that he had just one piece, a bag.

At this point in the conversation, Candelaria told defendant that he worked a drug interdiction program on the Amtrak train and talked to people coming from California daily because there was a problem with people transporting narcotics back to the mid-west or east; he immediately thereafter asked defendant if there was "anything in your room right now?" Defendant said there was not.

Candelaria then asked if defendant would voluntarily consent to a search of his luggage and defendant said he would not and asked Candelaria why he wanted to search it. Candelaria repeated that it was part of their program to talk to people

---

**43.** The aisle is approximately 2 feet wide and the landing at the head of the stairs is slightly wider.

traveling out of southern California, that they search people's bags and sometimes find something and sometimes don't, to which defendant responded "There is nothing in there." Candelaria again asked for consent to search and again defendant refused saying "I have my own personal belongings."

The conversation then changed to whether and where defendant had stayed near San Diego. Defendant said that he stayed in La Jolla with a friend. Candelaria stated that he had checked defendant's reservations to which defendant replied that he had stayed at the Inn By the Sea for one day, and left its phone number as the callback when making his train reservation. Defendant explained that he checked out of the hotel and then stayed with a friend. Further, defendant said his name was not "Chuck" or "Mike", that he lived at 1430 Belmont in Chicago, that he checked into the hotel under the name Peter Sinclair, that he did not give the hotel an address of 810 North Wells, Chicago, Illinois or a Chicago phone number 296–0632.[44] Defendant next stated that he had flown to California the prior week and had stayed with a friend in San Diego who gave him a ride to Los Angeles.

At this point Candelaria told defendant that they were going to his room and Candelaria would have a dog, trained to detect narcotics, sniff defendant's luggage. That eventually occurred, and the dog alerted to the gray hard-sided suitcase. Candelaria took the luggage, obtained a search warrant, and discovered 56.7 pounds of marijuana in the suitcase.

Candelaria never told defendant that he did not have to talk to Candelaria, that he could terminate the conversation or the encounter at any time, or that he could refuse a search of his luggage or a sniff of it by a dog. Throughout the conversation, Candelaria and defendant spoke in normal tones, but on several occasions Candelaria asked questions in a rapid fashion.

As of July 24, 1992 defendant was 24 years old. He has a high school education and by his own estimation is intelligent. He resides outside of Chicago in an upper class neighborhood. At the time of his encounter with Candelaria, defendant was not under the influence of drugs, nor was he ill. Defendant is approximately 5 feet 10 to 11 inches tall and weighs approximately 170 pounds. Candelaria is 5 feet 7 inches tall and weighs 150 pounds.

Although defendant had been arrested the prior year on July 30, 1991 for shoplifting, he did not undergo any interrogation regarding that crime and no one advised him of his rights in connection with the arrest. The shoplifting charge was dismissed because court personnel could not find the file.

Based on the foregoing facts, under the ruling in *Ward,* I find that Candelaria seized defendant without reasonable suspicion when Candelaria first approached defendant in the small corner of the passageway through car 430 and asked him potentially incriminating questions. Although defendant was not in or even close to his roomette at that time, the encounter between Candelaria and defendant occurred in a very confined area, in which defendant was backed into a corner, and another law enforcement officer was waiting nearby at the bottom of the stairs. Candelaria was extremely close to defendant and no one else except Torres stayed in the vicinity during the questioning.

I consider the corner of the passageway in which Candelaria confronted defendant to be a "quasi-public place;" it was slightly more public than a roomette, yet certainly not as public as the platform or a coach car or a dining car. Few people need to walk through the sleeper cars which are the last cars on the train and which do not house many passengers. A reasonable person in the position of defendant would have believed that he was alone with a police officer throughout the conversation.

---

**44.** Defendant denied supplying the North Wells address or Chicago phone number to the hotel personnel, which prompted defense counsel to insinuate that hotel receptionists make errors in registering guests, whether innocent or culpable. Deja vu.

Moreover, even though Torres was not visible during the encounter, defendant was aware that Candelaria was working with another officer whom he had recently seen in the train hallway and whom he believed was a short distance away at the bottom of the stairs. Thus, defendant reasonably felt outnumbered by police officers, thereby increasing the coercive nature of the encounter.

Finally, Candelaria never advised defendant that at any time he had the right to terminate the encounter and Candelaria asked defendant direct, blunt questions which would make a reasonable innocent person feel like the specific object of the officer's inquiry. I conclude a reasonable person in defendant's position would not have felt free to leave or to avoid talking to Candelaria or to terminate the encounter which Candelaria initiated.

Candelaria had obtained the following information about defendant by the time the seizure occurred under the *Ward* analysis:

1. Defendant was traveling alone in a small roomette.

2. Defendant was eastbound from Los Angeles, a narcotics source city, headed for Chicago.

3. Defendant had bought a one way ticket the day prior to the date of departure.

4. Defendant paid for his ticket with cash.

5. When he made his train reservation, defendant left the phone number of the Inn by the Sea in La Jolla, California.

6. Defendant had checked into the Inn by the Sea without a prior reservation, had paid for his room with cash, and had checked out the day before he commenced travel. (However, the checkout date had been misstated to Candelaria).

7. Defendant had given the Inn by the Sea a Chicago address and phone number.

8. When Candelaria dialed the Chicago phone number he heard a message from "Mike" and "Chuck" on an answering machine.

9. Defendant had one large suitcase in his roomette.

Under the discussions in *Ward, Bloom,* and *Hall,* all of the above factors are consistent with innocent travel. Indeed, factors 1–4 are identical to four of the factors in *Ward.* Furthermore, in *Ward,* the court found that it was consistent with innocent travel to give a telephone number with a Tucson prefix even though defendant boarded the train in Flagstaff. In *Hall,* the court said that it was not "objectively suspicious" that defendant, who boarded the train in Reno, had left a call-back number of a California travel agency. In view of those conclusions in *Ward* and *Bloom,* defendant's leaving the number of a hotel at which he had very recently stayed as a call-back number must also be considered consistent with innocent travel. The fact that defendant gave the hotel a Chicago address and phone number is completely consistent with other information Candelaria had about defendant at that time, that is, defendant was headed to Chicago. A recorded telephone message mentioning names other than those used by defendant does not evidence criminal activity but merely indicates that defendant may have shared a home with other young men. Finally, in *Bloom* the court ruled that keeping two high quality suitcases in defendant's private roomette was wholly consistent with innocent travel. Accordingly, I find almost weightless the fact that defendant kept his suitcase in his roomette. The fact that defendant called his suitcase a "bag" when Candelaria asked him if he had any luggage is also totally consistent with innocent travel as a suitcase may well be called a "bag" by innocent travelers. In an accepted dictionary definition the words "bag" and "suitcase" are synonymous. *Webster's Third New International Dictionary,* (3d ed.) 1971.

Defendant also had told Candelaria that his name was "Peter Sinclair" when in fact, defendant's name is Peter Sola. However, Candelaria had no reason to believe that defendant was lying about his name. Moreover, according to *Ward,* as interpreted by *Bloom,* traveling under an alias is consistent with innocent travel.

Even if the seizure of defendant did not occur when Candelaria first began to interrogate defendant, under *Bloom,* Candelaria certainly seized defendant when Candelaria told him that (1) he worked a drug interdiction program on the Amtrak train; (2) he talked to people coming from California traveling east since there was a problem with people transporting drugs to the midwest and east; and (3) he specifically asked defendant "anything in your room right now?" At this moment, Candelaria had not obtained any additional suspicious information about defendant since all of defendant's answers to Candelaria's questions up to that point were consistent with the information which Candelaria already knew about defendant. Therefore, even if the seizure happened at this later time, Candelaria still did not have reasonable suspicion that defendant was engaging in criminal activity.

Any inconsistencies or additional suspicious information which Candelaria may have developed thereafter through the continued questioning is irrelevant since Candelaria discovered that information while he was illegally detaining defendant. Thus, the fact that defendant told Candelaria his name was not "Mike" or "Chuck," the fact that defendant said his address was 1430 Belmont, and the fact that defendant denied leaving the 810 North Wells address and the 296–0632 number at the hotel bear no weight on my decision that Candelaria unconstitutionally seized defendant.

 Finally, defendant did not consent to have Candelaria seize his luggage and subject it to a dog sniff. The following conversation immediately preceded the seizure of defendant's luggage:

> SC: OK, what we're going to do at this time is we have a narcotic dog waiting outside for us. What we're going to do is we're going to have him examine that piece of bag.
>
> Defendant: OK
>
> SC: OK, no problem with that.
>
> Defendant: No problem.

Government's Exhibit 1. Thus, Candelaria informed defendant that he was going to subject defendant's bag to a dog sniff. Candelaria did not ask defendant if he could have a dog sniff his bag or if defendant would consent to having a dog sniff his bag. Defendant was not given the option of declining the dog sniff. Instead, defendant simply agreed that what Candelaria had told him would happen was going to happen. Defendant testified that he said "OK" because he did not want to cause a problem with a police officer. "If he tells me what I'm going to do, that's what I'll do." Finally, even if defendant had consented to having a dog sniff his luggage, such consent would not have been voluntary since it would have been given during an illegal detention when no intervening circumstances existed to mediate the taint of that consent.

Therefore, defendant's motion to suppress should be granted. Because I have granted defendant's motion to suppress on the ground defendant was seized without reasonable suspicion, I need not address defendant's novel contention that dogs' noses, far from being fallible due to a lack of sensitivity, are hyper-sensitive, leading these well-trained canines to alert to mere traces of drug residue which, as defendant argues, pervades almost every nook and cranny of our society, thereby rendering meaningless the legal theory that dog alerts create probable cause to search.

## V. CONCLUSION

On January 15, 1992, the historical train station house in Albuquerque burned to the ground. This sad loss may, or may not, make this the concluding chapter of the saga of the Southwest Chief and Albuquerque's DEA Task Force. Gone now are the local sources of manifests and other information of interest to the law enforcement officers who "work" the train in Albuquerque. However, there are no signs that the "War on Drugs" is drawing to a close. As this battle continues, we must be ever mindful that the courts "are not empowered to suspend constitutional guarantees so that the Government may more effectively wage a 'war on drugs.' If that war is to be fought, those who fight it must

respect the rights of individuals, whether or not those individuals are suspected of having committed a crime." *Bostick,* —— U.S. at ——, 111 S.Ct. at 2388 (Justice O'Connor).

IT IS THEREFORE ORDERED that each of the motions to suppress in these seven cases is GRANTED and all evidence obtained as a result of the illegal detentions is suppressed.